## STATE OF CONNECTICUT *v.* DUANE B. JOHNSON
## (SC 15132)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

---

Argued February 20—officially released July 22, 1997

*Louis S. Avitabile*, special public defender, with whom, on the brief, was *Meryl Anne Spat*, for the appellant (defendant).

*Jack W. Fischer*, assistant state's attorney, with whom were *Mark S. Solak*, state's attorney, and, on the brief, *Harry Weller*, assistant state's attorney, *Ronald G. Weller*, deputy assistant state's attorney, and *David Scannell*, legal intern, for the appellee (state).

*G. Douglas Nash*, chief of legal services, and *Gerard A. Smyth*, chief public defender, filed a brief for the office of the chief public defender as amicus curiae.

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether, under the circumstances of this case, felony murder can serve as the predicate murder for a capital felony conviction. The defendant, Duane B. Johnson, was charged in an amended information with felony murder in violation of General Statutes § 53a-54c,[1] capi-

---

[1] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

tal felony in violation of General Statutes § 53a-54b (1),[2] burglary in the first degree in violation of General Statutes §§ 53a-101 (a) and 53a-8,[3] larceny in the third degree in violation of General Statutes §§ 53a-119, 53a-124 (a) (2) and 53a-8,[4] and twenty counts of stealing a

[2] General Statutes § 53a-54b provides in relevant part: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety . . . while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

[3] General Statutes § 53a-101 provides in relevant part: "Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone. . . ."

General Statutes § 53a-8 provides: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"(b) A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

[4] General Statutes § 53a-119 provides in relevant part: "Larceny defined. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes,

firearm in violation of General Statutes §§ 53a-212 and 53a-8.[5] The charges against the defendant stemmed from his involvement in the burglary of a sporting goods store that culminated in the shooting death of Connecticut State Trooper Russell Bagshaw. Following a jury trial, the defendant was convicted on all counts. He appealed to this court from the judgment of conviction pursuant to General Statutes § 51-199 (b) (3). We reverse the judgment of conviction on the capital felony count and remand the case to the trial court with direction to vacate the capital felony conviction and to resentence the defendant on the felony murder conviction, and we affirm the judgment of conviction on the remaining counts.

The jury could have reasonably found the following facts. On June 5, 1991, sometime after midnight, the defendant and his brother, Terry Johnson, broke into the Land and Sea Sports Center (sporting goods store) in North Windham. Once inside, Terry loaded a nine millimeter semi-automatic pistol and handed the pistol out the window to the defendant. Terry also passed approximately twenty shotguns and rifles, boxes of ammunition and other merchandise through the window to the defendant, who carried them to Terry's car.

Meanwhile, Bagshaw was patrolling the area near the sporting goods store in his police cruiser. At approxi-

obtains or withholds such property from an owner. . . ."

General Statutes § 53a-124 provides in relevant part: "Larceny in the third degree: Class D felony. (a) A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

See footnote 3 of this opinion for the text of § 53a-8.

[5] General Statutes § 53a-212 provides in relevant part: "Stealing a firearm. Class D felony. (a) A person is guilty of stealing a firearm when, with intent to deprive another of his firearm or to appropriate the same to himself or a third party, he wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3. . . ."

See footnote 3 of this opinion for the text of § 53a-8.

mately 3 a.m., the defendant saw Bagshaw's cruiser approaching the sporting goods store and warned Terry Johnson. Terry then climbed out the store's window, grabbed the loaded pistol and waited near the corner of the building. As Bagshaw drove up the driveway toward the store, Terry began shooting at the cruiser. His gunshots hit and fatally wounded Bagshaw. The defendant and Terry then fled. Additional facts will be provided where necessary.

After his conviction, but before sentencing, the defendant filed a motion in arrest of judgment pursuant to Practice Book § 905,[6] claiming that a charge of capital felony based on the commission of a felony murder is not a cognizable offense under the laws of Connecticut. After the state declined to seek the death penalty on the capital felony conviction, the trial court denied the motion and sentenced the defendant to life imprisonment without the possibility of release on the capital felony conviction, ten years imprisonment on the burglary count, five years imprisonment on the larceny count and three years imprisonment on each of the twenty counts of stealing a firearm. The defendant's sentences on the burglary, larceny and firearms counts were to run concurrently with the capital felony sentence. No sentence was imposed on the defendant for the felony murder conviction, which was merged with the capital felony conviction in order to avoid exposing the defendant to double jeopardy. The total effective sentence was life imprisonment without the possibility of release.

On appeal, the defendant claims that the trial court improperly denied: (1) his motion in arrest of judgment;

[6] Practice Book § 905 provides: "—Motion in Arrest of Judgment

"On motion of the defendant, the judicial authority shall arrest judgment if the indictment or information does not charge an offense or if the judicial authority was without jurisdiction of the offense charged. The motion in arrest of judgment shall be made prior to the imposition of sentence."

(2) his motion to suppress two oral statements that the defendant had made before having been advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and (3) his motion to suppress his two written statements, which, although preceded by *Miranda* warnings, were the product of the allegedly illegally obtained oral statements. After the parties filed their briefs in the present appeal, we decided a similar case, *State* v. *Harrell*, 238 Conn. 828, 681 A.2d 944 (1996). In *Harrell*, we held that the term "murder" as used in the capital felony statute, § 53a-54b, could be applied only to intentional murder. Id., 839. Consequently, this court concluded that, under the circumstances of that case, the defendant's conviction for two counts of arson murder under General Statutes § 53a-54d[7] could not serve as the predicate murders for a charge of capital felony. Id.

In light of our decision in *Harrell*, we ordered supplemental briefing in the present appeal limited to the following three issues: "(1) Under the circumstances of this case, as a matter of statutory construction, can the defendant's conviction for felony murder under General Statutes § 53a-54c properly serve as the predicate murder for purposes of the capital felony statute, General Statutes § 53a-54b? (2) What effect, if any, does this court's decision in *State* v. *Harrell*, [supra] 238 Conn. 828 . . . have on the resolution of this question? (3) [What are] the possible constitutional consequences, if any, under the federal and state constitutions of a construction of § 53a-54b that provides for a conviction of felony murder as the predicate murder under § 53a-54b?" We conclude that, under the circumstances

---

[7] General Statutes § 53a-54d provides: "Arson murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

of this case, the defendant's conviction for felony murder under § 53a-54c cannot serve as the predicate murder for capital felony under § 53a-54b. The trial court, therefore, improperly denied the defendant's motion in arrest of judgment. As for the defendant's remaining claims, we conclude that the trial court properly denied the defendant's motion to suppress his oral and written statements.

## I

The defendant first claims that, under the circumstances of this case, his conviction for felony murder under § 53a-54c cannot serve as the predicate murder for the crime of capital felony under § 53a-54b. In support of this argument, the defendant relies on our recent holding in *State* v. *Harrell*, supra, 238 Conn. 839, that an unintentional murder cannot serve as the predicate murder for capital felony. The defendant argues that *Harrell* controls the resolution of the present case because his conviction for felony murder was based on the claim that Bagshaw was killed in the course of the burglary, not on any claim that the defendant intentionally murdered, or aided in the murder of, Bagshaw. The state seeks to distinguish *Harrell* on the ground that the present case does involve an intentional murder, whereas *Harrell* did not. We agree with the defendant that *Harrell* is dispositive and conclude that, under the circumstances of this case, the defendant's felony murder conviction cannot serve as the predicate murder for capital felony.

In *Harrell*, we were presented with the question of whether the term "murder" as used in § 53a-54b included unintentional as well as intentional murder.[8]

[8] The specific subdivision of the capital felony statute at issue in *Harrell* was § 53a-54b (8), which provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) *murder* of two or more persons at the same time or in the course of a single transaction . . . ." (Emphasis added.)

The state argued that, in the absence of any language limiting the term solely to intentional murder, "murder" refers to the three types of murder recognized in the penal code: intentional murder under General Statutes § 53a-54a, felony murder under § 53a-54c, and arson murder under § 53a-54d. Id., 831, 833–34. The defendant argued that, in light of the legislative history of the capital felony statute, the term "murder" refers only to intentional murder under § 53a-54a. Id., 834. When the legislature enacted the present capital felony statute in 1973, it contemporaneously repealed the felony murder statute, leaving intentional murder as the only form of murder expressly recognized under the penal code. Id., 835–36. The defendant argued that, when the legislature later enacted the present felony murder statute in 1974, it did not evince an intent to expand the scope of the capital felony statute to include felony murder as a predicate offense. Id., 836. In the alternative, the defendant argued that the term "murder" was at least ambiguous and, thus, should be construed in favor of the defendant. Id., 831.

To determine whether the term "murder" in the capital felony statute includes unintentional as well as intentional murder, we employed the familiar principles of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . We are also mindful of well established principles that govern the construction of penal statutes. Courts must avoid imposing criminal liability where the legislature has

not expressly so intended. . . . Accordingly, [c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." (Citations omitted; internal quotation marks omitted.) Id., 832.

After applying these principles, we stated: "After a careful consideration of the parties' arguments concerning the language of the capital felony statute and the statute's relationship to other provisions of the penal code, and a review of the relevant legislative history, we are persuaded that it is not apparent that the legislature unambiguously intended both intentional and unintentional murder to fall within the meaning of the term 'murder' in the capital felony statute. In light of the ambiguity surrounding the proper scope of the definition of 'murder,' we must construe that term in favor of the defendant. . . . We therefore hold that the term 'murder' in the capital felony statute may be applied only to intentional murder. Accordingly . . . under the circumstances of this case, the two counts of arson murder could not serve as predicate murders for a charge of capital felony under § 53a-54b (8)." (Citations omitted.) Id., 838–39.

After a thorough review of the statutory construction arguments raised by the parties in the present case, we conclude that these same arguments were raised and fully addressed in *Harrell*. In fact, the state concedes that in *Harrell* we rejected its argument that the term "murder" in § 53a-54b encompasses both intentional and unintentional murder. Furthermore, the state acknowledges that *Harrell* stands for the proposition that the term "murder" as used in § 53a-54b "may be properly applied only to intentional murder and does not encompass unintentional murder." Faced with this precedent, the state does not raise any new arguments that would clarify the legislature's intent in using the term "murder" in the capital felony statute, nor does

the state argue that *Harrell* should be overruled. Instead, the state argues that the holding of *Harrell* should be limited to its facts, which are distinguishable from those of the present case. We are not persuaded.

The state seeks to distinguish *Harrell* on the ground that it did not involve an intentional murder, whereas the present case does. According to the state, there was sufficient evidence introduced at trial for a finding that Terry Johnson intentionally murdered Bagshaw. The state argues that the intentional murder committed by Terry can be used as the predicate murder for the *defendant's* capital felony conviction and that such a result is permissible under *Harrell*.

Contrary to the state's argument, however, our holding in *Harrell* cannot be stretched to support this novel proposition. In *Harrell*, we held that "the term 'murder' in the capital felony statute may be applied only to intentional murder." Id., 839. This requirement of an intentional murder refers to the underlying murder that the defendant was *convicted of* and that served as the predicate offense for the capital felony conviction. See General Statutes § 53a-54b ("[a] person is guilty of a capital felony who is *convicted of* any of the following: [1] *Murder* of a member of the Division of State Police . . . [or] [8] *murder* of two or more persons at the same time or in the course of a single transaction" [emphasis added]). Whether the predicate offense was murder under subdivision (1) of § 53a-54b, as in the present case, or murder under subdivision (8), as in *Harrell*, the requirement of an intentional murder refers to the underlying murder of which the defendant was convicted.

It is important to note that, in the present case, the state did not charge the defendant with intentional murder or aiding an intentional murder. In the amended information brought against the defendant, the state

charged the defendant with felony murder under § 53a-54c, in that the defendant "committed or attempted to commit [b]urglary and in the course of and in further-ance of such [b]urglary or of the flight therefrom, he, or another participant, if any, caused the death of a person, to wit: Connecticut State Trooper Russell Bag-shaw who was other than one of the participants in said [b]urglary." This language tracks the language of the felony murder statute. See General Statutes § 53a-54c ("[a] person is guilty of murder when . . . he com-mits or attempts to commit . . . burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants"). Furthermore, the trial court did not charge the jury on a theory of intentional murder or aiding an intentional murder, nor did the state request such a charge.[9] Rather, the trial court charged the jury that the defendant would be guilty of felony murder if, in the course of and in furtherance of the burglary, he or another person *caused* Bagshaw's death. The defendant was charged, tried and convicted of felony murder, not intentional murder or aiding an intentional murder.[10]

We conclude that *Harrell* is dispositive and hold that, under the circumstances of the present case, felony

[9] Even during closing argument, the state did not claim that the defendant committed an intentional murder or aided in the commission of an inten-tional murder. Instead, the state asserted that the defendant participated in the burglary and that, in the course of and in furtherance of this burglary, Terry Johnson caused Bagshaw's death.

[10] The dissent and the state argue that the holding of *Harrell* should be limited to the particular subdivision of the capital felony statute involved in that case, namely, § 53a-54b (8). We disagree. Neither the dissent nor the state offers any support in the text or the legislative history of § 53a-54b for why the term "murder" in subdivision (1) should be given a different meaning than the same term in subdivision (8). It is a familiar principle of statutory construction that "where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance." *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 694, 674 A.2d 1300 (1996).

murder cannot be the predicate murder for capital felony. Accordingly, we conclude that the trial court improperly denied the defendant's motion in arrest of judgment.[11]

Having determined that the capital felony conviction cannot stand, we must next consider the defendant's claim that he is entitled to a new trial. The defendant claims that he was denied the right to a fair trial by having to defend against the capital felony charge. He contends that he was prejudiced by the introduction of evidence that the victim was a police officer, a fact he claims is material only to a charge of capital felony based on the murder of a police officer in violation of § 53a-54b (1). We are not persuaded.

The victim's status as a police officer would have been a material fact even in the absence of a charge of capital felony under § 53a-54b (1). Bagshaw was murdered in the course of, and as a result of, performing his duties as a police officer in discovering a burglary in progress. That burglary was the predicate felony for the defendant's conviction on the felony murder charge. Bagshaw's status as a state trooper was undisputed and would necessarily and appropriately have been introduced into evidence even in the absence of a capital felony charge. We conclude that the defendant has failed to meet his burden of demonstrating prejudice and, accordingly, we deny the defendant's request for a new trial. See *State* v. *McGann*, 199 Conn. 163, 178–79, 506 A.2d 109 (1986) (case remanded to trial court to vacate capital felony conviction and to resentence defendant on underlying murder conviction).

## II

The defendant's next claim on appeal is that the trial court improperly admitted into evidence two oral state-

---

[11] Because we conclude that the defendant's capital felony conviction must be vacated, we need not reach the constitutional issues we raised in our request for additional briefing by the parties.

ments he had given to the police on the day after the murder. The defendant argues that he was in police custody at the time he made the statements and that the police did not advise him of his rights under *Miranda* v. *Arizona*, supra, 384 U.S. 478–79, before interrogating him. The state responds that *Miranda* warnings were not required because the defendant was not in custody at the time he made the statements. We agree with the state.

Before trial, the defendant filed a motion to suppress two oral statements and two written statements, all of which he had given to the police on June 6, 1991. At a pretrial suppression hearing, the trial court, *Sferrazza, J.*, denied the motion on the basis that the defendant was not in custody at the time he made the statements. In his memorandum of decision, Judge Sferrazza found the following facts.

On the morning of the murder, the detectives who were investigating the crime scene discovered that a boat in the yard of the sporting goods store had been propped up against the store beneath a shattered window. Metal bars protecting this window had been sawed off and lay on the ground below. Blood stains were discovered on one of these bars, as well as on the window casing. In addition, the detectives noticed a shoe print on the boat. A witness told the police that he had seen a gray Volkswagen Rabbit, with its headlights turned off, exiting the driveway of the store at approximately 3 a.m. The witness assisted the detectives in creating a composite drawing of the driver, who was described as a white male under twenty-five years of age.

The next day, the detectives learned that Terry Johnson, who had just been arrested for an altercation with an off-duty police officer, had been at a bar near the crime scene the night before. Detectives Thomas

Davoren and Lawrence Gibeault met with Terry and noted that he resembled the witness' composite drawing and that his hands bore lacerations. They learned that Terry drove a gray Volkswagen Rabbit, which was parked at his father's home at that time. They discovered, however, that the pattern on the soles of his sneakers did not match the footprint found on the boat.

Davoren and Gibeault, who were dressed in civilian clothes, and a uniformed police officer then drove to the home of the defendant's father in an unmarked police car. The detectives saw a gray Volkswagen Rabbit parked at the house. They observed a shoe print on one bumper of the car that matched the pattern of the shoe print found on the boat at the crime scene. They also saw blood on the interior of one of the car doors. Soon after their arrival, the defendant's father arrived at the house. The detectives explained to him why they were there. He told them that Terry Johnson had been at the house the day before and had had an animated discussion with the defendant in the driveway, during which Terry had appeared to be agitated and the defendant had appeared to be angry with Terry.

The defendant then approached the house in his car, slowed down and put his turn signal on. Instead of turning into the driveway, however, he continued straight past the house. Suspecting that the defendant might know something about Terry Johnson's involvement in the burglary and shooting, Gibeault and the uniformed police officer entered the unmarked police car and drove after the defendant. They had driven approximately 100 yards when the defendant turned his car around and returned to the house. The police followed him into the driveway.

The detectives asked the defendant if he would be willing to speak to them inside the house. The defendant agreed. The detectives also asked the defendant's father

for permission to speak with his son in his house. He also agreed. The two detectives and the defendant sat at the kitchen table while the defendant's father and the uniformed police officer stayed outside. Davoren told the defendant that the defendant knew why the detectives were there and that the defendant had a story to tell. Gibeault then produced a copy of the composite drawing. The defendant stated that he did not know how to begin, and Davoren suggested that the defendant use a "once upon a time" method. The defendant then told the detectives about the burglary and the shooting of Bagshaw. At some point during the defendant's recounting of events, his father entered the kitchen to get a portable telephone and left. The detective then asked the defendant to repeat the story with more detail, and the defendant did so.

The defendant's first recitation of the events took approximately seven minutes and the second recitation took approximately twenty-five minutes. Judge Sferrazza found that "[t]hroughout this period of time, the detective[s] remained reserved and as neutral as possible. They refrained from any shouting, threatening, or menacing behavior. They made no promises to the defendant nor did they restrain his ability to move in any fashion. The defendant never asked the detectives to leave or cease questioning. Nor did he express a desire to leave or speak to his father or anyone else . . . ."

After the defendant completed the second recitation of the events, Davoren read him his rights under *Miranda* v. *Arizona*, supra, 384 U.S. 478–79. The defendant then waived his rights to remain silent and to obtain the assistance of counsel, and gave two written statements to the detectives.

Judge Sferrazza further found that the defendant was "an eighteen year old, literate member of the [United

States] Army Reserve," and that "[i]n this familiar setting [of his father's kitchen], the defendant had access to his car, a phone, refreshments, and his father. The detectives did not lay their hands upon the defendant, nor did they utter words or make gestures restricting his movement in any way." The court concluded that "no reasonable person would have believed, under these circumstances, that his freedom of movement has been curtailed in any fashion." As to the circumstances surrounding the giving of the second statement, the court found that "[t]he only differences in circumstance between the first and second oral statements were the passage of seven minutes, the detective's request that the story be repeated, and the fact that the defendant had incriminated himself. While the defendant might reasonably have surmised that, because of his admission of assisting in the burglary, he might eventually be arrested for that burglary, no action on the detectives' part would have led a reasonable person to believe his own words suddenly converted freedom into custody." The court concluded that, based upon these findings, the defendant was not in custody at the time he made the two oral statements.

At trial, the defendant objected to the introduction of his two oral and two written statements given to the police on June 6, 1991. The trial court, *Spada, J.,* adopted Judge Sferrazza's findings and concluded that the defendant was not in custody at the time he made the statements. Accordingly, the trial court overruled the defendant's objection.

On appeal, the defendant first claims that his two oral statements were unlawfully obtained because the police failed to advise him properly of his rights under *Miranda* v. *Arizona,* supra, 384 U.S. 478–79, before subjecting him to custodial interrogation. We disagree.

"The defendant has the burden of proving custodial interrogation . . . before the state must prove that

adequate warnings of the rights that inhere in the privilege against self-incrimination were given to the defendant and that the defendant's waiver of his rights was constitutionally valid . . . . Custodial interrogation [occurs when] questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . . Although the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . A person is in custody only if a reasonable person would have believed he was not free to leave. . . . We must look at the totality of the circumstances of the questioning in order to determine whether a reasonable person would have construed those circumstances as placing him in a custody situation. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 76, 621 A.2d 728 (1993). "We first examine the trial court's conclusion regarding the historical facts in order to determine whether it is clearly erroneous. We next conduct an independent review in light of the totality of the circumstances by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody." *State* v. *Atkinson*, 235 Conn. 748, 759 n.17, 670 A.2d 276 (1996); see also *Thompson* v. *Keohane*, 516 U.S. 99, 112–114, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (historical facts surrounding custody reviewed for clear error; ultimate determination of custody reviewed de novo).

On the basis of our review of Judge Sferrazza's findings, as adopted by Judge Spada, we agree that the defendant was not in custody when he made his two oral statements to the police. The detectives, who had

approached the defendant at his father's home, had asked the defendant if he would speak with them, and he had voluntarily agreed to do so. The interview took place in the familiar surroundings of his father's kitchen. There was no evidence that the defendant was ever handcuffed or otherwise restrained at the time of the statements, nor did the officers use or threaten the use of force, or display their weapons. The court expressly found that the police had been neutral and reserved. The defendant had access to a telephone. The defendant's father entered the kitchen during this period. The defendant never expressed a desire to leave, stop talking, or speak with his father. Under these circumstances, we cannot conclude that the defendant has met his burden of proving custodial interrogation.

The defendant nonetheless argues that he was in custody from the moment the unmarked police car pulled out from the driveway of his father's house and followed him back. He contends that he exercised his freedom by not pulling into the driveway at first, as he had originally intended to do, and that the police displayed a show of authority by following him back to his father's home. This claim, however, is contrary to the defendant's own testimony. At the suppression hearing, the defendant himself testified that he had not seen a uniformed police officer in his driveway, had driven past his house to get a soda, but then had changed his mind, had turned his car around and had driven back to the house because he "was going to go home." Furthermore, Gibeault and the police officer followed the defendant in an unmarked car that did not display a police light. We conclude that, under these circumstances, a reasonable person would not believe that his freedom of movement was restricted by a display of police authority. We conclude, therefore, that the trial court properly allowed the defendant's two oral statements to be admitted into evidence at trial. Because

we determine that the oral statements were legally obtained, the defendant cannot prevail on his additional claim that his written statements should have been suppressed as the product of the alleged initial illegality.

The judgment of conviction of capital felony is reversed and the case is remanded with direction to vacate the capital felony conviction and to resentence the defendant on the felony murder conviction; the judgment of conviction on the remaining counts is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, BERDON, KATZ and PALMER, Js., concurred.

MCDONALD, J., concurring and dissenting. I disagree with part I of the majority opinion,[1] which reverses the defendant's conviction of capital felony and vacates his sentence of life imprisonment without the possibility of release. In doing so, the majority relies on *State* v. *Harrell*, 238 Conn. 828, 681 A.2d 944 (1996). I submit that the present case should not be controlled by *Harrell*, where this court refused to apply the death penalty to multiple arson murders.

The jury could and did find that Connecticut State Trooper Russell A. Bagshaw was killed when he interrupted the defendant, Duane B. Johnson, and his brother, Terry Johnson, while they were burglarizing a gun shop at 3 a.m. The Johnsons were loading the guns from the shop into the defendant's vehicle, parked near the shop, when Trooper Bagshaw drove his cruiser toward them. The defendant warned Terry Johnson, who was inside the building, that the cruiser was approaching. The two then waited in the dark outside the shop as the Trooper drove nearer. Terry Johnson, without warning from him or the defendant, repeatedly fired into the cruiser with a stolen handgun that he had loaded during the burglary. Trooper Bagshaw was

---

[1] I concur with part II of the majority opinion.

fatally wounded and left to bleed to death in the cruiser while the Johnsons escaped. Terry Johnson had also parked his vehicle in the gun shop yard and each drove off in his own vehicle. With the defendant were the stolen guns, some of which had been loaded into his car after the Trooper was shot.

After the defendant was convicted of felony murder and capital felony, he was sentenced to life imprisonment without the possibility of release.

In *Harrell*, the defendant was charged with arson murder and capital felony for his role in the arson of an apartment building and the resulting deaths of two people. In that case, bowing to the special rule of lenity in death penalty cases, we refused to allow its possible imposition. We interpreted the legislative intent in enacting the capital felony statute as not imposing the death penalty in a case of unintended multiple arson murders. This case is different. In this case, we do not have the crime of arson murder, which may be punished by life imprisonment without parole, may be proven by a reckless burning resulting in death and may truly be an unintended homicide. Here also, the jury did not impose the death penalty. I do not agree that *Harrell* applies to this felony murder of a state trooper acting within the scope of his duties.

Our fundamental objective in interpreting the meaning of a statute, as pointed out in *State* v. *Harrell*, supra, 238 Conn. 832, is to give it the meaning that was intended by the legislature by looking to its plain words, its legislative history and the circumstances of its passage, and its relationship to existing legislation and common law and legislative policy.

The plain words of the capital felony statute; General Statutes § 53a-54b; indicate that it was meant to apply where a law enforcement officer is murdered while acting within the scope of his duties. The statute does

not, therefore, protect an officer from murder, intentional or unintentional, because of his profession when not acting "within the scope of his duties." General Statutes § 53a-54b. Because a law enforcement officer's principal duties under General Statutes § 54-1f (b) and (d) are to arrest those persons committing crimes, it is plain that the severe penalties were designed to protect Trooper Bagshaw. Here, it is clear that Trooper Bagshaw was killed because he was a police officer.

At common law, felony murder applied the penalties for intentional murder to those persons who participated in dangerous or violent felonies resulting in death. *State* v. *Edwards*, 163 Conn. 527, 532, 316 A.2d 387 (1972); *State* v. *Cross*, 72 Conn. 722, 729, 46 A. 148 (1900). The penal code, by statute, carries that scheme forward to the present day. Both intentional murder and felony murder are now simply defined as "murder." See General Statutes §§ 53a-54a and 53a-54c. The purpose of felony murder was and is to deter the commission of such crimes and to protect the innocent lives of victims, law enforcement officers and bystanders. See 2 F. Wharton, Criminal Law (15th Ed. Torcia 1994) § 147, p. 300, citing *People* v. *Satchell*, 6 Cal. 3d 28, 489 P.2d 1361, 98 Cal. Rptr. 33 (1971).

The history in this state of the murders of state troopers[2] and other police officers bears out the stark fact that those murders occurred mainly as the officers attempted to apprehend persons committing dangerous or violent crimes. See *State* v. *Chapman*, 103 Conn. 453, 130 A. 899 (1925); *State* v. *Donahue*, 141 Conn. 656, 109 A.2d 364 (1954), appeal dismissed and cert. denied,

---

[2] Prior to Trooper Bagshaw's death, three other state troopers had been murdered, all while interrupting violent crimes: Trooper Irving H. Nelson in 1928 (shot during armed robbery); Trooper Ernest J. Morse in 1953 (shot by operator of stolen vehicle); and Trooper Joseph M. Stoba, Jr., in 1962 (shot while attempting to resolve domestic dispute). 1996 Membership Directory, Connecticut State Police Academy Alumni Assn., Inc., p. 68.

349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257 (1955).[3] This fact could hardly escape the attention of the legislature. History clearly supports an intention to protect police officers interrupting armed felonies.

The majority's narrow reading of the capital felony statute was not intended by the legislature. It deprives police officers and the public they serve of needed protection. It bars the imposition of a life sentence without release for a crime that strikes at the heart of our justice system and at the public's safety. Hereafter, because the killer of a police officer and the other participants in a dangerous felony had other crimes as their objective, both the killer and those participants will be beyond the reach of the capital felony statute.

Upon receiving his badge, Trooper Bagshaw subscribed to a code of honor. He swore: "I will serve the State of Connecticut honestly and faithfully and, if need be, lay down my life as others have done rather than swerve from the path of duty." 1996 Membership Directory, Connecticut State Police Academy Alumni Assn., Inc., p. 69. The badge should be both a symbol of lawful authority and, by the law's sternest protection, a shield from harm. It is simply unreasonable to conclude that the General Assembly meant to give Trooper Bagshaw and his fellow law enforcement officers anything less.

I see no reason to interpret our law so narrowly to absolve this defendant of capital felony and to revoke his sentence.

---

[3] In late 1977, this state began compiling and publishing annual reports on crime. See State of Connecticut, Annual Uniform Crime Reports (1978–1995). A review of these reports reveals that the total number of Connecticut law enforcement officers killed in the line of duty from 1978 to 1995 was eleven. Of those deaths, five were caused by felonious acts.

On the national level, a total of 1418 federal, state and local law enforcement officers were feloniously killed over the same period of time. Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 1995, table 3.160, p. 377.