STATE OF CONNECTICUT *v.* JAMAAL COLTHERST
(SC 16516)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued December 9, 2002—officially released May 6, 2003

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, was *James E. Thomas*, state's

attorney, and *Dennis J. O'Connor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Jamaal Coltherst, appeals[1] from the judgment of conviction, rendered after a jury trial, of capital felony in violation of General Statutes §§ 53a-54b (5)[2] and 53a-8 (a),[3] murder in violation of General Statutes §§ 53a-54a (a)[4] and 53a-8 (a), felony murder in violation of General Statutes § 53a-54c,[5] kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) (2) (B)[6] and 53a-8 (a), robbery

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-54b (5) provides that a person is guilty of a capital felony if that person is convicted of "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[5] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[6] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ."

in the first degree in violation of General Statutes § 53a-134 (a) (2),[7] robbery in the second degree in violation of General Statutes §§ 53a-133[8] and 53a-135 (a) (1),[9] larceny in the first degree in violation of General Statutes §§ 53a-119,[10] 53a-122 (a) (3)[11] and 53a-8 (a), conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-48 (a)[12] and 53a-92 (a) (2) (B),[13] and larceny in the fourth degree in violation of § 53a-119 and General Statutes § 53a-125 (a).[14] The defendant claims on appeal that the trial court improperly (1) instructed the jury that it could convict him of

[7] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[8] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[9] General Statutes § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present . . . ."

[10] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[11] General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars . . . ."

[12] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[13] See footnote 6 of this opinion.

[14] General Statutes § 53a-125 (a) provides: "A person is guilty of larceny in the fourth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds five hundred dollars."

murder under the doctrine set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946) (*Pinkerton* doctrine); (2) instructed the jury that it could convict him of capital felony under the *Pinkerton* doctrine; (3) instructed the jury concerning certain evidence pertaining to consciousness of guilt; (4) allowed the state to cross-examine him with respect to subsequent misconduct; (5) refused to admit a coconspirator's statement into evidence; and (6) admitted the defendant's written escape plan as evidence of consciousness of guilt. We reject the defendant's claims and affirm the judgment of the trial court.

I

FACTS

The jury reasonably could have found the following facts. On the morning of October 15, 1999, the defendant was released from the Manson Youth Institute, a correctional institution located in Cheshire, where he had been incarcerated for violating probation after having been convicted on charges of assault in the third degree. His mother and his grandfather picked him up at the institute and drove him to their house on Plain Drive in East Hartford. At some point during the day, a friend of the defendant, Jamarie Cole, came by to visit. The defendant and Cole were sitting outside together when, at about 3 p.m., another of the defendant's friends, Carl Johnson, came up to them. Johnson indicated that he was going to "do something" that night. The defendant understood Johnson to mean that he was going to rob someone. Johnson told the defendant that he would meet him later and left.

At approximately 6:30 p.m., Johnson returned to the defendant's house. Johnson was riding a mountain bike and carrying a bike for the defendant to ride. The defendant, seeing that Johnson was dressed entirely in black, went to his room and changed into black clothes. John-

son and the defendant then rode the bicycles to a parking lot near the defendant's house, where the defendant asked Johnson to show him the gun that Johnson previously had indicated he would be carrying. Johnson showed him a black .22 caliber pistol and let him hold it. They then proceeded to an exotic dance club known as Kahoots, located on Main Street in East Hartford, arriving at approximately 7:30 p.m. They parked the bicycles in the bushes behind the club and then walked around the parking lot to identify cars that they might want to carjack.

The defendant and Johnson previously had discussed how they would commit the carjacking. Their plan was to approach the first person who came out of the club, at which point Johnson would point the gun at the person's head and demand the car keys. The defendant would take the keys, and the defendant and Johnson would force the person into the car. They would then drive to a place far away from any telephones or cars and leave the person there. Johnson told the defendant that he had rope and tape in his backpack if they needed to restrain the person.

The defendant and Johnson identified approximately three desirable cars in the Kahoots parking lot, but they decided to leave because it was early and they knew that people would not be leaving the club until later. At that point they rode down Main Street to the Triple A Diner, where they continued to look for cars to carjack. They determined that the diner was too busy for them to commit a robbery without being seen. They then rode their bicycles across the street to Dunkin Donuts, where they had seen a Lexus automobile in the parking lot. They hid in the bushes near the car but left after waiting for about one-half hour for the owner of the car to come out.

The defendant and Johnson then returned to Kahoots, arriving at approximately 9 p.m. They hid their bicycles

behind the Rent-A-Wreck building located next to the club. They saw a 1999 Toyota 4Runner parked in the Rent-A-Wreck parking lot and waited there for the driver to return so that they could carjack the car. While they were waiting, a black Honda Accord pulled up behind Rent-A-Wreck. The driver, later identified as Kyle Holden (victim), exited the car and went into Kahoots. Some time later, when the victim came out of Kahoots and headed toward his car, the defendant and Johnson ran up to him. Johnson pointed his gun at the victim's head and demanded the keys to the car. The defendant took them. Johnson then gave the gun to the defendant and took the keys himself. Johnson and the defendant forced the victim into the backseat of the car, where the defendant joined him. They then drove to an automatic teller machine (ATM) located next to the Triple A Diner. The defendant took the victim's wallet, removed his ATM card and demanded the victim's personal identification number. The defendant than gave the card to Johnson, who used it to withdraw money from the ATM.

Johnson then drove to a nearby entrance ramp for Interstate 84, where he pulled over to the side of the road. The defendant and Johnson got out of the car, and the defendant gave the gun to Johnson. Johnson then ordered the victim to get out of the car. The victim went to the far side of the guardrail, where he sat down. The defendant removed the victim's belongings from the car and then got back into the car's passenger side seat. At that point, the defendant saw Johnson shoot the victim at point blank range in the back of the head.[15]

---

[15] The defendant gave a statement to the police, which was admitted into evidence, in which he claimed that he had watched as Johnson shot the victim as he sat on the far side of the guardrail. The state produced evidence at trial, however, that the victim's body was found at the foot of the steep, heavily vegetated embankment adjacent to the entrance ramp, not at the top of the embankment near the guardrail; the body was found facedown with the feet together and the arms by the sides; there was nothing about the body's appearance or the appearance of the embankment to suggest

The victim died within seconds. Johnson then got back into the car. The defendant asked him why he had shot the victim, and Johnson said that he did not want any witnesses. Johnson had been wearing a pair of black gloves, which he placed in the car's glove compartment.

Over the next eight days, the defendant and Johnson continued to use the car. Bank transaction records showed that, on October 16, 1999, the victim's ATM card was used at an ATM machine located on Park Avenue in Bloomfield to make three separate withdrawals from the victim's checking account, for a total of $280. A surveillance camera at that ATM machine photographed Johnson and the defendant in the victim's car as they made the withdrawals.

Meanwhile, on October 16, 1999, East Hartford police officer Gerard Scagliola was on patrol in East Hartford when he noticed the victim's car being operated in what he considered to be a suspicious manner. He entered the car's license plate number into his cruiser's computerized search system, which revealed no irregularities. On October 19, 1999, the Avon police department received a report that the victim, who had been a resident of Avon, was missing. During their investigation, the Avon police learned of Scagliola's computer inquiry and focused their search for the victim and his car on the area of East Hartford where Scagliola had seen the car. On October 24, 1999, Sergeant Robert Whitty of the Avon police department was patroling in East Hartford in connection with the investigation when he saw a black Honda matching the description of the victim's

that the victim had tumbled down the embankment after being shot; the sneakers that Johnson wore on the night of the murder had dirt on the soles; and both front footwells of the stolen Honda were littered with dirt and leaves when the car ultimately was recovered by the police. The state argued to the jury that this evidence showed that the victim was shot execution style after having been led by the defendant and Johnson to the bottom of the embankment.

car. Whitty, who was in an unmarked car, followed the Honda and used a cell phone to call the East Hartford police department to request additional police officers. The Honda pulled into a parking lot on Plain Drive. Whitty pulled up behind it, exited his car and identified himself as a police officer. Four individuals, ultimately identified as Johnson, the defendant, Rashad Smith and Damion Kelly, emerged from the Honda. Whitty drew his service revolver and ordered the four individuals to lie in a prone position behind the Honda. The East Hartford police arrived within approximately one minute and arrested the four individuals.

In the hours following his arrest, the defendant gave the police several inconsistent statements concerning his involvement in the crimes. At trial he testified and denied any involvement. He claimed that the police had fabricated the statements and that he had signed them without reading them.

After a jury trial, the defendant was convicted of capital felony, murder, felony murder, kidnapping in the first degree, robbery in the first degree, robbery in the second degree, larceny in the first degree, conspiracy to commit kidnapping in the first degree, and larceny in the fourth degree. The trial court merged the convictions of capital felony, murder, felony murder and kidnapping in the first degree and imposed a sentence of life imprisonment without the possibility of release on the capital felony count, twenty years imprisonment on the count of robbery in the first degree, ten years imprisonment on the count of robbery in the second degree, twenty years imprisonment on the count of larceny in the first degree, twenty years imprisonment on the count of conspiracy to commit kidnapping in the first degree, and one year imprisonment on the count of larceny in the fourth degree, all to be served consecutively to the sentence of life imprisonment, for a total effective sentence of life imprisonment without

the possibility of release followed by seventy-one years imprisonment. This appeal followed. Additional facts and procedural history will be set forth as required.

## II

## CONVICTION OF MURDER UNDER *PINKERTON*

The defendant claims that the trial court's instruction to the jury that it could convict the defendant for murder under the *Pinkerton* doctrine was improper because (1) the application of *Pinkerton* has been limited, as a matter of state criminal law, to cases where the defendant had the intent to commit the substantive crime with which he is charged and (2) it violated the due process clause of the fourteenth amendment because it relieved the state of its burden of proving every element of the crime.[16] Specifically, he argues that the

[16] The defendant challenges the following instructions given by the trial court. "Now ladies and gentlemen, I wish to instruct you on the subject of vicarious liability or what we commonly refer to as a *Pinkerton* charge. I will now instruct you on the principle of vicarious liability, which is separate and distinct from accessorial liability and which applies to count one, capital felony, and count two, murder. There is a doctrine in our law that provides that once a defendant's participation in a conspiracy is established beyond a reasonable doubt, he is responsible for each of the criminal acts of the other coconspirators which is within the scope of and in furtherance of the conspiracy. As just explained, the defendant is charged in count eight of the information with conspiracy to commit kidnapping in the first degree. This principle of vicarious liability means that if you conclude that the defendant is guilty of the crime of conspiracy to commit kidnapping in the first degree beyond a reasonable doubt but that the defendant did not shoot [the victim], then you would go on to determine whether sufficient evidence has been provided to convince you beyond a reasonable doubt that another member of the conspiracy, Carl Johnson, did, in fact, commit the crime of murder as I have defined that crime for you. If you conclude beyond a reasonable doubt that Carl Johnson did commit the crime of murder, and if that murder was within the scope of and in furtherance of the conspiracy of which you have concluded that the defendant was a member, then the defendant would be guilty of murder even though he did not personally commit the murder, provided certain other conditions were met beyond a reasonable doubt.

"First, that the fatal shooting of [the victim] must be found by you to have been a necessary or natural consequence of the unlawful agreement, the conspiracy to commit first degree kidnapping; and second, that the

instructions allowed the jury to convict him of intentional murder without finding that he had intended to kill the victim. We reject this claim.

The defendant concedes that this issue was not preserved and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In *Golding*, this court held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitu-

murder of [the victim] was reasonably foreseeable to the coconspirator sought to be held responsible, that is, the defendant . . . as a necessary or natural consequence of the unlawful agreement, the conspiracy to commit kidnapping in the first degree.

"A coconspirator could be held liable for the murder committed by another coconspirator only if that crime was a natural, probable and reasonably foreseeable consequence of the common plan and was committed while acting in pursuance of or in furtherance of the common design, that is, the conspiracy. All who join in a common design to commit an unlawful act, the natural or necessary and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance or in furtherance of a common design. The phrase 'in furtherance' was intended to impose the requirement of a relationship between the underlying common design and the homicide.

"Before you could convict the defendant of murder vicariously, that is, premised on the act of his coconspirator, if you find that Carl Johnson actually shot and murdered [the victim], you would have to determine whether if the participants, the coconspirators, kidnapped the victim at gunpoint . . . it reasonably was within their contemplation that the . . . victim might be shot and killed. When the participants had kidnapped the victim at gunpoint, you may, depending on all the circumstances you find proven by the credible evidence, find that it is within the contemplation of those parties that the victim may be shot and killed."

The trial court also instructed the jury that "[w]ith respect to counts one and two, that's the capital felony and the murder, your possible verdicts as regards each would be not guilty, guilty as an accessory or guilty by way of vicarious liability. As a part of the unanimity requirement, you must all unanimously agree whichever of those three possible verdicts is to be returned." The jury returned a verdict on both counts of guilty by vicarious liability.

tional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id. We conclude that the record is adequate for review and that the claim is of constitutional magnitude. See *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995) (failure to instruct jury on element of crime violates due process rights). Accordingly, the claim is reviewable. We conclude, however, that the trial court's *Pinkerton* instruction was proper and that the defendant's claim therefore fails under the third prong of *Golding*.

The standard of review for claims of instructional impropriety is well established. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993). The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . *State* v. *Figueroa*, 235 Conn. 145, 170, 665 A.2d 63 (1995). Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . *State* v. *Anderson*, 212 Conn. 31, 37, 561 A.2d 897 (1989). Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995)." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 536–37, 679 A.2d 902 (1996).

We begin our analysis of the defendant's claim with a review of our case law applying the *Pinkerton* doctrine. This court first explicitly adopted the *Pinkerton* principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under the *Pinkerton* doctrine, which, as of the date of our decision in *Walton*, was "a recognized part of federal criminal conspiracy jurisprudence"; id., 43; "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." Id., citing *Pinkerton* v. *United States*, supra, 328 U.S. 647–48. The rationale for the principle is that, when "the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct." *State* v. *Walton*, supra, 46.

We concluded in *Walton* that the *Pinkerton* principle was applicable in state criminal cases, reasoning, "first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. See General Statutes § 53[a]-4.[17] Without foreclosing the use of the *Pinkerton* doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton*, in which [1] the defendant was a leader of the conspiracy, [2] the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and [3] the offense was proved by one or more of the overt acts alleged in support of the conspiracy

[17] General Statutes § 53a-4 provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions."

charge. *State* v. *Walton,* supra, [227 Conn.] 44–46, 50–51." *State* v. *Diaz,* supra, 237 Conn. 526–27.

In *State* v. *Diaz,* supra, 237 Conn. 518, we were required to "decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of [the three *Walton*] conditions have been met, a question that we expressly reserved in *Walton.*" Id., 527. In *Diaz,* the defendant had been convicted of, inter alia, murder under the *Pinkerton* doctrine and conspiracy to commit murder. Id., 519–20. The evidence showed that the defendant, along with several other individuals, had fired multiple gunshots into a motor vehicle occupied by the victim and three others. Id., 522–23 and n.7. The victim was struck and killed by a single bullet. Id., 523. The defendant claimed on appeal that the court's instruction under the *Pinkerton* doctrine had been improper because, among other reasons, it was broader than the limited version of the doctrine recognized in *Walton.* Id., 525–26. This court acknowledged that the state had not proved that the defendant was the leader of the conspiracy to ambush the vehicle and its occupants and, thus, had not established the first condition for *Pinkerton* liability set forth in *Walton.* Id., 529. We noted, however, that "the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers." Id. We concluded that "where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct." Id. We further concluded that "*Pinkerton* liability may be imposed

even if *none* of the three *Walton* conditions is present."
(Emphasis added.) Id., 527.

We also acknowledged, however, that "there may be
occasions when it would be unreasonable to hold a
defendant criminally liable for offenses committed by
his coconspirators even though the state has demon-
strated technical compliance with the *Pinkerton* rule.
. . . For example, a factual scenario may be envisioned
in which the nexus between the defendant's role in the
conspiracy and the illegal conduct of a coconspirator
is so attenuated or remote, notwithstanding the fact
that the latter's actions were a natural consequence of
the unlawful agreement, that it would be unjust to hold
the defendant responsible for the criminal conduct of
his coconspirator. In such a case, a *Pinkerton* charge
would not be appropriate." (Citation omitted.) Id., 530.

The defendant argues that *Diaz* stands for the propo-
sition that, as a matter of state policy, *Pinkerton* liability
may be imposed *only* where the state has established
that the defendant had the level of intent required by
the substantive offense with which he is charged. We
disagree. The defendant in *Diaz*, in addition to claiming
that the application of *Pinkerton* in that case was an
improper extension of *Walton*, had challenged the trial
court's *Pinkerton* instruction on the ground that "*Pin-
kerton* liability is inconsistent with our penal code
because it allows a jury to convict a defendant of murder
even though the defendant did not himself have the
specific intent to cause the death of another as required
under § 53a-54a (a)." Id. He argued that to apply *Pinker-
ton* under such circumstances impermissibly would
intrude upon the felony murder statute, § 53a-54c,
which, he argued, "sets forth an exclusive list of conduct
for which a defendant may be convicted of murder
without having the intent to kill as required under § 53a-
54a (a)." Id., 530–31. We concluded that *Pinkerton* did
not intrude upon the felony murder statute because,

while a defendant may be convicted of felony murder even if neither he nor his confederates had any intent to kill, "[u]nder the *Pinkerton* doctrine . . . a defendant may not be convicted of murder *unless one of his criminal associates*, acting foreseeably and in furtherance of the conspiracy, caused the victim's death with the intent to do so." (Emphasis added.) Id., 531. Thus, in *Diaz*, we clearly recognized that, under *Pinkerton*, a coconspirator's intent to kill may be imputed to a defendant who does not share that intent, provided, of course, that the nexus between the defendant's role and his coconspirator's conduct was not "so attenuated or remote . . . that it would be unjust to hold the defendant responsible . . . ." Id., 530.

The defendant in the present case also claims that the application of *Pinkerton* under the facts of this case violates due process because it relieves the state of the burden of proving an element of the crime, namely, intent to kill. Again, we disagree. The defendant does not dispute the notion that *Pinkerton* constitutionally may reach *conduct* in which the defendant did not engage. We fail to see why a constitutional flaw appears when *Pinkerton* applies to the *intent* that accompanies that conduct. Both the intent and the conduct are essential elements of the crime and are subject to the principles of *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), that due process requires the state to prove every element of the offense charged beyond a reasonable doubt. The United States Supreme Court in *Pinkerton* itself acknowledged that *Pinkerton* rests on the same principles as those governing accessory liability, which allow conduct to be imputed to a defendant. Our research has uncovered no case in which any court has suggested that accessory liability offends due process. We fail to see, therefore, why the imputation of intent under *Pinkerton* would do so.

We note that the only other case that we have been able to discover that has directly addressed the issue raised by the defendant in the present case reached the same conclusion. In *United States* v. *Alvarez*, 755 F.2d 830 (11th Cir.), cert. denied, 474 U.S. 905, 106 S. Ct. 274, 88 L. Ed. 2d 235 (1985), cert. denied sub nom. *Portal* v. *United States*, 482 U.S. 908, 107 S. Ct. 2489, 96 L. Ed. 2d 380 (1987), the United States Court of Appeals for the Eleventh Circuit concluded that the intent to commit a substantive crime committed by coconspirators may be imputed to a defendant under *Pinkerton*. That case involved an undercover sting operation conducted by federal drug agents. In the words of the Court of Appeals, the sting operation "turned into tragedy when a shoot-out erupted between the dealers and two [of the federal agents]. During the shoot-out, one of the . . . agents was killed and the other agent, along with two of the cocaine dealers, was seriously wounded." Id., 836. Nine defendants were convicted on various federal charges in connection with the incident. All of the defendants were convicted of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. Id. The two shooters were convicted of first degree murder of a federal agent in violation of 18 U.S.C. §§ 1111 (a)[18] and 1114,[19] and

[18] Section 1111 of title 18 of the United States Code provides in relevant part: "(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree. . . ."

[19] Section 1114 of title 18 of the United States Code provides: "Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or

three other defendants were convicted, under the *Pinkerton* doctrine, of second degree murder of a federal agent in violation of 18 U.S.C. §§ 1111 (a) and 1114. Id. Those three defendants appealed on the ground that they could not be convicted under the *Pinkerton* doctrine when the murder was not an intended purpose of the conspiracy. Id., 849.

The Court of Appeals noted that it "[had] not found, nor has the government cited, any authority for the proposition that all conspirators, regardless of individual culpability, may be held responsible under *Pinkerton* for reasonably foreseeable but originally unintended substantive crimes."[20] Id., 850. It also took note of "the potential due process limitations on the *Pinkerton* doctrine in cases involving attenuated relationships between the conspirator and the substantive crime." Id. The court then pointed out, however, that the evidence established that none of the three defendants had been a minor participant in the drug conspiracy and that all had been aware that deadly force might be used to prevent apprehension by the federal officers. Id., 850–51. The court concluded that "the individual culpability of [the three defendants was] sufficient to support their murder convictions under *Pinkerton*,

on account of that assistance, shall be punished—

"(1) in the case of murder, as provided under section 1111;

"(2) in the case of manslaughter, as provided under section 1112; or

"(3) in the case of attempted murder or manslaughter, as provided in section 1113."

[20] The court also stated that "[t]he imposition of *Pinkerton* liability for such crimes is not wholly unprecedented." *United States* v. *Alvarez*, supra, 755 F.2d 850 n.25, citing *Government of Virgin Islands* v. *Dowling*, 633 F.2d 660, 666 (3d Cir.) (defendant convicted of conspiracy to commit bank robbery and of assault in connection with coconspirator's firing gun at pursuing police), cert. denied, 449 U.S. 960, 101 S. Ct. 374, 66 L. Ed. 2d 228 (1980), and *Park* v. *Huff*, 506 F.2d 849, 859 (5th Cir.) (defendant convicted of conspiracy to sell alcoholic beverages and of murder in connection with coconspirators' dynamite bombing of prosecuting attorney), cert. denied, 423 U.S. 824, 96 S. Ct. 38, 46 L. Ed. 2d 40 (1975).

despite the fact that the murder was not within the originally intended scope of the conspiracy. In addition, based on the same evidence, we conclude that the relationship between the three [defendants] and the murder was not so attenuated as to run afoul of the potential due process limitations on the *Pinkerton* doctrine." Id., 851. Accordingly, the court concluded that the trial court properly had instructed the jury that it could impose *Pinkerton* liability for the murder of the federal officer on the three defendants, even though the evidence had not established that they had committed the murder or shared the shooters' intent to kill. Id.

We note that the *Pinkerton* defendants in *Alvarez* also claimed that the trial court's "lesser-included offense instruction allowed the jury to reach an improper compromise verdict."[21] Id. Although this claim is not directly pertinent to the present case, we take note of it in order to forestall any potential confusion arising from the fact that the three defendants in *Alvarez* were convicted under *Pinkerton* of a lesser crime, namely, second degree murder, than the actual shooters had been convicted of, namely, first degree murder, when it would appear, as the defendants in *Alvarez* argued, that, "under the *Pinkerton* doctrine, the jury had only two legitimate options: it could find them guilty of the crime committed by their coconspirators, or it could acquit them." Id. Specifically, we note that, because of the apparently inconsistent verdict, the possibility cannot be excluded that the jury in that case did not *impute the shooters' state of mind* to the defendants, but, instead, convicted them of a crime for which the jury determined they actually had the requisite state

---

[21] The trial court instructed the jury in *Alvarez* that if it found "that a murder was committed but that the element of premeditation was lacking or [the jury had] a reasonable doubt as to whether the murder was committed with premeditation, then in that event [the jury] should return a verdict of murder in the second degree." (Internal quotation marks omitted.) *United States* v. *Alvarez*, supra, 755 F.2d 851–52 n.28.

of mind.[22] The Court of Appeals recognized the inconsistency between the verdicts against the shooters and the three defendants under *Pinkerton* and noted that "the jury properly could have convicted [the three defendants] of first degree murder under *Pinkerton*, but chose for some unknown reason not to do so." Id., 852. The court concluded, however, that that inconsistency was not a sufficient reason to set aside the verdicts. Id. It is clear, therefore, that the trial court's instruction allowed the jury to impute the shooters' intent to kill to the *Pinkerton* defendants, and that the Court of Appeals found that instruction to be proper.

We conclude that the *Pinkerton* doctrine constitutionally may be, and, as a matter of state policy, should be, applied in cases in which the defendant did not have the level of intent required by the substantive offense with which he was charged.[23] The rationale for the doc-

[22] We cannot determine if the jury could have found that the defendants had the requisite state of mind or what that state of mind might have been because the *Alvarez* opinion does not contain the trial court's charge to the jury on "malice aforethought," which is an element of both first degree murder and second degree murder under 18 U.S.C. § 1111.

[23] The defendant argues that this conclusion leads to the bizarre result that a defendant convicted of felony murder may raise the affirmative defense set forth in § 53a-54c, while a defendant convicted of intentional murder under the *Pinkerton* doctrine may not. Section 53a-54c provides in relevant part that "it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

We do not perceive any anomaly. Although neither intentional murder under the *Pinkerton* doctrine nor felony murder require the state to establish the defendant's subjective intent to kill, they are two different offenses and reasonably may have different defenses. For example, a defendant charged with felony murder for a killing committed by another cannot claim as a defense that the shooter did not have an intent to kill; see *State* v. *Castro*, 196 Conn. 421, 429, 493 A.2d 223 (1985) (intent to kill is not element of felony murder); while that would be a defense to charges of intentional

trine is to deter collective criminal agreement and to protect the public from its inherent dangers by holding conspirators responsible for the natural and probable— not just the intended—results of their conspiracy. See *State* v. *Walton,* supra, 227 Conn. 46. This court previously has recognized that "[c]ombination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." (Internal quotation marks omitted.) *State* v. *Robinson,* 213 Conn. 243, 252 n.6, 567 A.2d 1173 (1989), overruled on other grounds, *State* v. *Colon,* 257 Conn. 587, 778 A.2d 875 (2001). In other words, one natural and probable result of a criminal conspiracy is the commission of originally unintended crimes. When the defendant has "played a necessary part in setting in motion a discrete course of criminal conduct"; (internal quotation marks omitted) *State* v. *Diaz,* supra, 237 Conn. 528; he cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for the natural and probable results of that conduct that, although he did not intend, he should have foreseen. The defendant in this case makes no claim that the nexus between his involvement in the conspiracy and Johnson's murder of the victim was "so attenuated or remote . . . that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator." Id., 530.

murder under the *Pinkerton* doctrine. See *State* v. *Murray,* 254 Conn. 472, 479, 757 A.2d 578 (2000) (specific intent to kill is essential element of crime of murder); *State* v. *Walton,* supra, 227 Conn. 43 (defendant can be convicted under *Pinkerton* of "criminal offenses committed by a coconspirator"). Moreover, although a defendant convicted of intentional murder under *Pinkerton* would not be entitled to invoke the statutory defense, such a defendant would be entitled to claim as a defense that his involvement in the conspiracy was too attenuated to the substantive offense for him to be subject to vicarious liability, which defense is substantively similar to the statutory defense.

Accordingly, we conclude that the trial court properly instructed the jury that it could convict the defendant of intentional murder under the *Pinkerton* doctrine.

## III

## CONVICTION OF CAPITAL FELONY UNDER *PINKERTON*

We next address the defendant's claim that the trial court improperly instructed the jury that a conviction for intentional murder under the *Pinkerton* doctrine could be the predicate murder for capital felony under § 53a-54b (5).[24] We reject this claim.

The defendant relies primarily on this court's decision in *State* v. *Harrell*, 238 Conn. 828, 681 A.2d 944 (1996), in support of his claim. In that case, we determined as a matter of statutory interpretation that the word "murder" as used in § 53a-54b means intentional murder as defined by Public Acts 1973, No. 73-137, § 2,[25] now codified as § 53a-54a (a). Therefore, we concluded in *Harrell* that the defendant's conviction for arson murder in violation of General Statutes § 53a-54d could not serve as a predicate murder for purposes of the capital felony statute. Id., 839; see also *State* v. *Johnson*, 241 Conn. 702, 713–14, 699 A.2d 57 (1997) (conviction for felony murder cannot be predicate for capital felony conviction).

Although we referred to arson murder and unintentional murder interchangeably in *Harrell*, we did not focus in that case on the effect of a defendant's subjective state of mind on the applicability of the capital felony statute. Rather, we focused on whether the legis-

---

[24] See footnote 16 for the text of the trial court's instruction.

[25] Public Acts 1973, No. 73-137, § 2 (a), provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes suicide by force, duress or deception . . . ."

lature had contemplated that a conviction under a specific section of the Penal Code, namely, § 53a-54d, could constitute murder for purposes of the capital felony statute. That narrow focus was also evident in *State* v. *Johnson*, supra, 241 Conn. 712. In that case, the state argued that the defendant's felony murder conviction could be the predicate for capital felony under § 53a-54b because the evidence established that the actual shooter had had an intent to kill. We rejected that argument, concluding that the capital felony statute's "requirement of an intentional murder refers to the underlying murder that the defendant was *convicted of* . . . ." (Emphasis in original.) Id. We emphasized that the defendant had been "charged, tried and convicted of felony murder, not intentional murder or aiding an intentional murder." Id., 713. It follows from this reasoning that, even when the evidence establishes that the defendant himself had an intent to kill, that subjective mental state would be irrelevant for purposes of applying § 53a-54b, in the absence of a conviction for intentional murder.[26] Conversely, a defendant's lack of subjective intent to kill should not preclude the state from bringing charges under § 53a-54b when the defendant has been convicted of intentional murder. Accordingly, our conclusions in *Harrell* and *Johnson* that arson murder and felony murder cannot provide the predicate for capital felony do not support the proposition that a conviction for intentional murder under the *Pinkerton* doctrine cannot provide the predicate for capital felony in cases where the defendant did not have the intent to kill.

There is no occasion in this case, as there was in *Harrell* and *Johnson*, to inquire into the legislature's intent in enacting § 53a-54b. There is no dispute that

[26] For example, if a defendant confessed that he had had an intent to kill, but pleaded guilty to felony murder pursuant to a plea agreement, his conviction of felony murder could not be the predicate for capital felony.

the legislature intended that intentional murder would be a predicate for capital felony under that statute. Instead, the question before us is whether, as authorized by § 53a-4, "the [*Pinkerton*] principle should be recognized as a matter of policy"; *State* v. *Walton*, supra, 227 Conn. 45; in cases involving intentional murder in which the defendant had no intent to kill. We have concluded in part II of this opinion that it should be, and constitutionally may be, recognized and, therefore, that the defendant properly was convicted of intentional murder. Accordingly, we conclude that the trial court properly instructed the jury that its verdict of guilty on that charge would provide the predicate for criminal liability under § 53a-54b (5).

The defendant argues, however, that allowing a conviction for intentional murder under the *Pinkerton* doctrine to serve as the predicate for capital felony would lead to the unfair result that a defendant convicted as an accessory to murder who, although sharing the principal's intent to kill, had a relatively minor role in the crime would have the benefit of the statutory mitigating factor set forth in General Statutes § 53a-46a (h) (4),[27] while a defendant who had no subjective intent to kill but was convicted under *Pinkerton* for the same murder would not. Because the state did not seek to impose the death penalty in this case, however, we conclude that we need not decide whether a defendant convicted of a capital felony under the *Pinkerton* doctrine could invoke § 53a-46a (h) (4) or, if not, whether such a result would be anomalous or unfair.

---

[27] General Statutes § 53a-46a (h) (4) provides that the court shall not impose the death penalty if the jury finds that the defendant "was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but the defendant's participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution . . . ."

IV

## INSTRUCTION ON CONSCIOUSNESS OF GUILT

We next address the defendant's claim that the trial court improperly instructed the jury with respect to a letter that the defendant had written to an alleged coconspirator and that the state offered as evidence pertaining to consciousness of guilt. We disagree.

The following facts and procedural history are relevant to this claim. On November 9, 1999, during a routine body search of the defendant, a correction officer, Scott Novak, found a letter in the defendant's sock.[28] The officer's supervisor, Captain John Patz, seized the letter and turned it over to the security division of the correctional facility. The state ultimately introduced the letter as evidence at trial.

---

[28] The letter stated in relevant part: "I need you to do some real shit right now. Yo, if you take your body, [I]'ll take responsibility for what I did. In order for me to get out of that E[ast] Hartford case, you have to say that I wasn't with you that day until all of that was over. Say out of the three hundred dollars that you got out of the ATM, you gave me a buck (a hundred), because it was my first night out . . . and I was flat broke. And say you came to my house with the car that night around 9:30–10:00 p.m. and I said w[h]ere did you get the car from? And you said it was a rent-a-car. I got dressed and hopped in the whip with you and we got some bud. We smoked, you got me high for my first night out . . . and took me back home around 11:30–12:00 p.m. Carl I promise you if you do this I won't play you. If and when I get out in the world I won't forget about you. I'll send a buck a month and Shad said he'll send you 10–15 dollars a week. . . . If you do what I asked you to do you'll be doing me a big favor and I'll be doing you a big favor. This is how I'll be doing you a big favor. With no gun and no witnesses they need me to testify in court against you. But if you say I wasn't there, the[re] is no way I can testify against you. When me and Shad was talking we made a lot of plans and got our . . . stories straight. The first thing on our plans was to try and get you out. I know we sound crazy to you right now, but we serious about this shit. We got in this shit with you and we gonna try our hardest to get out this shit with you. Carl I'm dead serious about every word I wrote in this letter. . . . [I]f I get out soon [I]'ll look out for your seed for you. . . . When you done reading this rip it to pieces and flush it!"

The defendant testified at trial and admitted that he had written the letter to Johnson. He also testified that he had written the letter because he had discovered that Johnson had implicated him in the crime and he wanted Johnson to tell the truth, i.e., that the defendant had not been involved. The defendant acknowledged on cross-examination that, in the letter, he offered money to Johnson to tell the police that he, the defendant, had not been involved. He also acknowledged that he offered to try to get Johnson out of jail in exchange for the alibi. The state argued to the jury that the letter showed the defendant's consciousness of guilt.

The trial court instructed the jury that "[i]n any criminal case, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may fairly have been influenced by the criminal act, that is, the conduct or statements may show consciousness of guilt. A defendant's false statements as to his whereabouts at the time of the offense might be offered because such conduct or statements tend to show a consciousness of guilt. It does not, however . . . rise to a presumption of guilt. It will be up to you as the judges of the facts to decide whether statements or conduct of the defendant reflect consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

Referring to the defendant's letter to Johnson, the court instructed the jury that "[t]his letter was allegedly written by the defendant and addressed to Carl Johnson. The contents of the letter included an offer of money by the defendant in exchange for providing him an alibi. If you find that the defendant wrote the letter, it may tend to show consciousness of guilt. However, it is of the utmost importance to remember that you are the judges of the facts; therefore, you must first determine whether the state has proven that . . . this letter is a statement of the defendant. Only then may

you consider whether it tends to show consciousness of the defendant's guilt."

The defendant argues that the trial court misstated the evidence and impugned the defendant's credibility by instructing the jury that the letter "was allegedly written by the defendant," when the defendant had testified that he wrote the letter. The defendant also argues that the trial court's instruction deprived him of his right to have the jury decide whether the letter constituted "an offer of money by the defendant in exchange for providing him an alibi." He concedes that this claim was not preserved but seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review and that the claim is of constitutional magnitude. See *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982) (defendant has constitutional right to have issue of fact decided by jury and not court). Accordingly, the claim is reviewable. We conclude, however, that the claim fails under the third prong of *Golding*.

The standard governing our review of claims of instructional impropriety is set forth in part II of this opinion. We previously have recognized that, in instructing the jury, "[a] trial court has broad discretion to comment on the evidence adduced in a criminal trial." *State* v. *Hernandez*, 218 Conn. 458, 461, 590 A.2d 112 (1991). Nevertheless, "[t]o avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . . Even where the defendant has presented no evidence, the [trial] court's summary of the evidence should try to give fair recognition to relevant points raised by the

defense in cross-examination as well as to the general theory of the defense. . . .

"In addition, a court must take care to avoid making improper remarks which are indicative of favor or condemnation . . . and must not indulge in an argumentative rehearsal of the claims of one side only. . . . Such proscriptions are of heightened importance in a criminal case, where considerations of due process require that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations. . . . [P]artisan commentary, if fairly established by the record . . . deprives defendants of the very essence of their constitutional right to a fair trial by an impartial jury." (Citations omitted; internal quotation marks omitted.) Id., 462–63.

We conclude that there was no such constitutional deprivation in this case. First, the trial court's statement that "[t]his letter was allegedly written by the defendant" merely allowed the jury to determine for itself whether the defendant had written the letter to Johnson. We recognize that, in light of the fact that it would have been in the defendant's self-interest to deny having written the letter, his undisputed testimony that he had written it was very strong evidence that he had done so. We are not persuaded, however, that, merely by emphasizing to the jury that it, not the court, was required to determine whether the defendant wrote the letter, the trial court impugned the defendant's credibility.

Nor are we persuaded that the jury was misled to believe that the only factual determination that it was required to make was whether the defendant had written the letter. The trial court's characterization of the

letter as "an offer of money by the defendant in exchange for providing him an alibi" was accurate and neutral and did not constitute an instruction to the jury that the alibi sought by the defendant was a fabrication, the ultimate issue to be determined by the jury. The defendant disputed neither that he had offered Johnson money in the letter nor that the money was to be in exchange for Johnson's statement. Moreover, the court clearly instructed the jury that the letter "*may* tend to show consciousness of guilt"; (emphasis added); and that, if it determined that the defendant had written the letter, it would have to "*consider* whether it tends to show consciousness of the defendant's guilt." (Emphasis added.) The court also stated that "[i]t will be up to you as the judges of the facts to decide whether statements or conduct of the defendant reflect consciousness of guilt and to consider such in your deliberations in conformity with these instructions." We conclude that, considered as a whole, the trial court's instructions reasonably could not have misled the jury to conclude that it was not required to make the ultimate determination as to the nature and purpose of the defendant's letter to Johnson. Accordingly, the defendant has not established that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial"; *State* v. *Golding*, supra, 213 Conn. 240; and his claim fails.

V

CROSS-EXAMINATION ON SUBSEQUENT
MISCONDUCT

We next address the defendant's claim that the trial court improperly allowed the state to cross-examine him on subsequent misconduct. We conclude that this claim was not preserved for review by this court.

The following facts and procedural history are relevant to this claim. The defendant testified at trial and

denied having made many of the statements contained in his written statements to the police. One of those statements indicated that the defendant had stated to the police that, on the night of the crime, he and Johnson "parked [their] bikes in the bushes behind Kahoots and walked around the parking lot looking for cars that [they] might want to jack." During cross-examination of the defendant, the state asked him what it meant to jack a car. The defendant replied, "I don't know, because I don't jack cars."

The following day, outside the presence of the jury, the state made an offer of proof with respect to a robbery and theft of an automobile and an ATM card that had occurred in Wethersfield four days after the crime in this case. On voir dire, outside the presence of the jury, the defendant testified that he had been involved in that incident. The state then requested that the court permit it to cross-examine the defendant regarding the Wethersfield crime or to admit into evidence a redacted version of the defendant's statement to the police concerning that crime. The state argued that the purpose of the cross-examination would be to impeach the defendant's testimony that he did not do carjackings. Defense counsel objected, arguing that the defendant had not been convicted of that crime and that the evidence would be more prejudicial than probative.

The next morning, after a discussion with counsel in chambers, the court indicated that the state had "now made an alternative proposal which basically is consistent with what was discussed in chambers and what I suggested might be an area of some sort of an accord. But, as I understand it, that's not the case . . . ?" Defense counsel responded that, "on further reflection and discussion with my client, that wouldn't be a problem." A short time later, however, defense counsel stated, "Well, I mean, let me say it wouldn't be a problem. It's certainly a problem. And we've discussed all

the law involved. But given what has been presented, which is, essentially, did you do this Wethersfield crime, this gun-toting, violent crime? And then expect this jury to use that only for credibility and not to convict him of that—this current offense based on what's alleged to have been said in another confession." The court responded that it would "give a very detailed limiting instruction" and requested that the state place on the record the questions that it intended to ask the defendant on cross-examination. The state did so.[29] A short time later, the court stated that "it appears that there's been some agreement as to the area of inquiry and the scope of the inquiry and the precise questions that have been stated here on the record by [the state's attorney]. I take it to that point—to that extent at least, the evidence is coming in without objection. Is that correct?" Defense counsel responded, "That's correct, Your Honor." Later that morning, the state cross-examined the defendant concerning his involvement in the Wethersfield incident.[30] The trial court instructed the jury

[29] The prosecutor stated: "I'm going to ask [the defendant] again: Is it true, sir, that you said on cross-examination the other day that you don't do carjackings? And four days after this particular incident, that is, October 19, 1999, did you have occasion in the town of Wethersfield to be involved in a forcible larceny of a car from an owner? And did you give a statement on October 25, 1999, to Detective Mark Miele of [the] Wethersfield police department while you were at the East Hartford police department? And did you sign that statement and was your oath taken to that statement by Detective Miele? As a result of that statement, were you arrested for a robbery and a larceny?"

[30] The following exchange took place:

"[Assistant State's Attorney]: . . . October 19, 199[9], were you involved in a forcible larceny of a car taken from the owner?

"[The Defendant]: Yes.

"Q. October 25, 1999, did you give a statement to Detective Miele, the gentleman that you described as the tall, bald-headed dude?

"A. Yes.

"Q. And as a result of that statement, were you arrested for that?

"A. Yes.

"Q. The charges are robbery and larceny, sir?

"A. Correct."

that it was to consider the evidence pertaining to the Wethersfield incident solely on the issue of the defendant's credibility.

It is well established that "[a]n objection must be made . . . in order to raise an evidentiary claim as a ground for error on appeal." *State* v. *King*, 216 Conn. 585, 590, 583 A.2d 896 (1990). When the defendant has "failed to object to what is clearly a question of the admissibility of the state's evidence, we decline to consider his evidentiary claim. To rule otherwise would amount to trial by 'ambuscade' of the trial judge." Id.

In this case, the defendant initially objected to being cross-examined on his involvement in the Wethersfield carjacking. During discussions in chambers and on the record, however, the parties reached an agreement limiting the scope of the proposed cross-examination. Although defense counsel continued to express some ambivalence over the admission of the evidence, when the trial court ultimately asked defense counsel whether he objected to the proposed cross-examination, as limited by the agreement, he clearly indicated that he did not. Defense counsel also made no objection after the cross-examination or after the court's limiting instruction. We conclude that, under these circumstances, to consider the merits of the defendant's evidentiary claim would amount to an ambuscade of the trial court. See Id. Accordingly, we decline to review this claim.

## VI

## EXCLUSION OF COCONSPIRATOR'S STATEMENT AS HEARSAY

The defendant next claims that the trial court improperly excluded as hearsay Johnson's statement to the police concerning his involvement in the crime, thereby violating the defendant's constitutional right to confrontation and to present a defense. The defendant sought

to admit the statement in order to show that Johnson had been the source of the information in the police statements attributed to the defendant, which the defendant denied having provided, and to impeach the testimony of a state's witness to the contrary. We conclude that the trial court improperly excluded Johnson's statement, but that its exclusion was harmless.

The following facts and procedural history are relevant to this claim. Detective Timothy Webster of the state police major crime squad testified at trial that, shortly after midnight on the morning of October 25, 1999, he had interviewed the defendant at the East Hartford police station. The defendant told Webster that he and several friends had taken the victim's Honda from a parking lot in West Hartford on October 21, 1999. Webster wrote down the defendant's statement, read it back to him and asked him to read it and to sign it if it was accurate. The defendant signed the statement.

Webster then left the interview room and spoke with Detective Eric Daigle, who was interviewing another occupant of the stolen Honda, Damion Kelly. Daigle told Webster that Kelly had indicated that the defendant had been seen in the Honda on October 16, 1999. Webster then confronted the defendant with this information. At that point, the defendant requested that Webster tear up his first statement and that he allow the defendant to give a second statement. Webster complied with both requests. Webster testified that, beginning at approximately 2:30 a.m. on October 25, 1999, the defendant gave a second statement, which Webster took down. The defendant then stated that the facts were as set forth in part I of this opinion up to the time that he and Johnson saw the victim enter Kahoots. He indicated that, at that point, Johnson told the defendant to keep a lookout in front of the building. The defendant saw the victim come out of Kahoots and about one minute later heard a gunshot. He then returned to the

back of the Rent-A-Wreck building, where he saw the victim lying on the ground and Johnson sitting in the driver's seat of the Honda.

Beginning at approximately 8 a.m. on October 25, 1999, Webster interviewed Johnson. Johnson gave a statement in which he indicated that the victim's body was located on the entrance ramp to Interstate 84.[31] At approximately 2:30 p.m., Webster confronted the defendant with Johnson's statement and took another statement from him. According to Webster, the defendant then stated that his previous statement that Johnson had shot the victim behind the Rent-A-Wreck building was not true. He stated instead that he and Johnson had forced the victim into the Honda and that, after obtaining money at an ATM, they drove to the entrance ramp to Interstate 84 where he saw Johnson shoot the victim. He also stated that during the shooting Johnson wore a pair of black gloves that he later placed in the glove compartment of the Honda.

The defendant testified at trial and denied having told the police that he had been present when the victim was kidnapped, robbed and killed. On cross-examination, the state questioned the defendant about each of the items of information contained in the written police statements and asked him if he was the source of each item and, if not, if he knew who was. The defendant again denied having been the source of any of the incriminating information in the statements. He testified that he had signed the statements, but that Webster had not permitted him to read the statements before he did so. Instead, he claimed that Webster had read the statements to him, omitting the parts that the defendant had not provided.

---

[31] Johnson's statement also contained other information that was inconsistent with all of the defendant's statements and was never revealed to the jury. For example, Johnson told the police that the defendant had shot the victim on the entrance ramp to Interstate 84.

On redirect examination, defense counsel questioned the defendant about Johnson's written statement to the police. The state objected on the ground that the statement was hearsay. Outside the presence of the jury, defense counsel argued that Johnson's statement was not hearsay because it was not being admitted for its truth, but to show that Johnson was the source of the information contained in the defendant's statements. The trial court sustained the state's objection.

During the state's rebuttal case, Webster testified that the information in the defendant's statements had come from the defendant and not from other sources. On cross-examination, defense counsel asked Webster to review Johnson's statement. The state again objected on the ground that the statement was not in evidence and was hearsay. The court ruled that, if the statement was not being offered for its truth, defense counsel could inquire about it. Defense counsel then continued with the cross-examination and started to read from Johnson's statement. The state again objected on the ground that the statement was not in evidence. The court again heard arguments on the admissibility of Johnson's statement outside the presence of the jury. Defense counsel argued that he needed to quote Johnson's statement verbatim in order to show that parts of it matched parts of the defendant's statements and that, therefore, Johnson's statement had to have been the source of the defendant's statements. He further argued that it was not sufficient merely to ask Webster whether the language in the statements was similar. The court determined that the statement was hearsay because the defendant was offering the statement "for the truth of this is what Johnson said. But there's no way the state can go into that because Mr. Johnson isn't here." The court ruled that it would allow defense counsel to ask Webster whether the language in Johnson's statement was similar to the language in the defen-

dant's statements, but that it would not allow him to ask about what precisely Johnson had said to Webster or the precise language in Johnson's statement. Defense counsel responded, "Fair enough."

Defense counsel then continued his cross-examination of Webster, referring him alternately to Johnson's statement and the defendant's statements. Webster testified that there were a number of similarities between the language of Johnson's statement and the language of the defendant's statements. On redirect, Webster testified that the defendant's second statement had been taken on October 25, 1999, from 2:30 a.m. to 4:30 a.m., and that Johnson's statement had been taken later that morning beginning at approximately 8 a.m. Accordingly, it would have been impossible for the information in Johnson's statement to have formed the basis of the defendant's second statement. Webster also testified that the defendant had provided the information contained in his second statement.

As a preliminary matter, we address the state's claim that this issue was not preserved. The state argues that, by responding "[f]air enough" to the trial court's ruling, the defendant indicated his intent to withdraw his offer to admit Johnson's statement into evidence. We disagree.

The state relies on State v. Kim, 17 Conn. App. 156, 157, 550 A.2d 896 (1988), in support of its claim that this issue was not preserved. In that case, the defendant had objected to the admission of evidence pertaining to the conduct of a defense witness. After a very brief colloquy with the state's attorney and the court, and before the court had ruled on his objection, defense counsel indicated his acquiescence with the admission of the evidence by stating, " 'Very well, Your honor.' " Id. In contrast, in the present case, defense counsel on multiple occasions vigorously expressed his view that

Johnson's statement was not hearsay for purposes of establishing that Johnson was the source of the information in the police statements attributed to the defendant. After listening to the arguments, the trial court sustained the state's objection to admitting the statement into evidence but indicated that it would allow limited examination on the statement. A reasonable understanding of defense counsel's remark in response to the trial court's ruling—"[f]air enough"—is that defense counsel intended to convey that he understood and would abide by the limitations on his use of the statement. In light of the entire record, we cannot conclude that the defendant intended to withdraw his claim that the statement was admissible or that the trial court reasonably could have understood him to have done so. Accordingly, we conclude that the defendant's claim is preserved.

Our standard of review for evidentiary rulings is well established. "We will set aside a trial court's evidentiary ruling only when there has been a clear abuse of its discretion. . . . The trial court has wide discretion in determining the [admissibility] of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Casanova*, 255 Conn. 581, 591, 767 A.2d 1189 (2001).

"When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, however, such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." Id., 592. If the improper exclusion of evidence implicates a defendant's constitu-

tional right to present a defense, "the burden falls on the state to demonstrate that the error was harmless beyond a reasonable doubt." *State* v. *Carter*, 228 Conn. 412, 428, 636 A.2d 821 (1994). "If the evidence may have had a tendency to influence the judgment of the jury, [its exclusion] cannot be considered harmless." (Internal quotation marks omitted.) Id.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. . . . However, [a] statement made out of court is not hearsay unless it is offered to establish the truth of the facts contained in the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Henry*, 253 Conn. 354, 364–65, 752 A.2d 40 (2000).

The defendant claims that the trial court improperly excluded Johnson's statement as hearsay. We agree. The defendant did not offer Johnson's statement to establish its truth. Indeed, he denied that it was true. Rather, the defendant offered the statement to establish that certain language in Johnson's statement was almost identical to language in the statements attributed to the defendant, thus permitting the jury independently to assess the credibility of Webster's testimony that the statements had separate sources. The court determined that Johnson's statement was inadmissible because the state could not cross-examine Johnson as to whether he had made the statements contained therein. The probative value and relevance of Johnson's statement did not depend, however, on whether Johnson actually had made those statements.[32] Moreover, whether John-

---

[32] It was the similarity of the statements that was probative. By eliciting testimony from Johnson that he had, in fact, provided the information in his statement, the state would have shown only that Webster had not fabricated the statement. The defendant, however, had made no claim that Johnson's statement was fabricated. By eliciting testimony that Johnson had not made the statements, the state would only have undermined the credibility of its own witness' testimony that Johnson had made the statements.

son had made the statements, as distinct from whether those statements were true, was a matter within Webster's personal knowledge and, therefore, one on which he could testify and be cross-examined. Because Johnson's statement was being offered to establish that it was the source of the information in the defendant's statement and to impeach Webster's testimony to the contrary, and not for its truth, it was not hearsay. Accordingly, we conclude that the trial court improperly excluded it.

We also conclude, however, that, although the exclusion of Johnson's statement was improper, it was harmless beyond a reasonable doubt. First, with respect to the defendant's second statement, the defendant makes no claim that the statement that was introduced into evidence was not the statement that he had signed in the early morning hours of October 25, 1999. He claims only that he did not read the statement himself, that Webster omitted the inculpatory portions when he read it to the defendant at that time, and that those portions must have come from Johnson. He has not explained, however, and we cannot conceive, how the jury reasonably could have concluded that the information obtained from Johnson beginning at 8 a.m. on October 25, 1999, provided the basis for the statement taken by Webster from the defendant beginning on 2:30 a.m. that same day. Therefore, the exclusion of Johnson's statement clearly was harmless with respect to the defendant's attempt to establish that the defendant had not provided the information in his second statement.

With respect to the defendant's third statement, in which he stated that he had seen Johnson shoot the victim on the entrance ramp to Interstate 84, we note that Webster acknowledged on cross-examination that he had obtained that statement after interviewing Johnson and confronting the defendant with Johnson's statement. Although the defendant was not permitted to

admit Johnson's statement into evidence, he was allowed to show it to Webster and cross-examine him on it. Webster acknowledged that Johnson's statement was similar to the defendant's statement in several respects. The only marginal evidentiary value of Johnson's statement would have been to allow the jury independently to assess the degree of similarity between the statements. Even if the jury had been permitted to see Johnson's statement, however, and had determined that certain statements in it were extremely similar to those in the defendant's statement, that finding would have been far from determinative on the issue of Webster's credibility. It could not have been surprising to the jury that two persons, responding to the same questions by the same person pertaining to the same incident, would provide similar information in similar language. Moreover, there is no dispute that Webster used the information that he obtained from Kelly and Johnson to obtain additional information from the defendant. The jury reasonably could have inferred that the converse was also true. Again, it could not have been surprising to the jury that, as the facts of the case became known to the police, the persons being questioned changed their statements to conform to those facts and the statements became increasingly similar. Presumably, the purpose of the interrogations had been to obtain a single, consistent version of the incident.

Indeed, the only evidence that Webster was not telling the truth when he testified that the defendant had been the source of the information in his statements was the defendant's testimony that he had not provided any self-incriminating information to the police. That testimony was undermined by the evidence establishing that (1) the defendant's second statement had been taken before Johnson's statement was taken and (2) the defendant's last statement contained incriminating informa-

tion that was not contained in Johnson's statement, e.g., that he watched as Johnson shot the victim and knew that during the shooting Johnson wore black gloves that he then placed in the glove compartment of the Honda. In order to believe the defendant, the jury would have had to believe that, contrary to Webster's testimony and the inferences to be derived from the information contained in the defendant's statements, the incriminating items of information that were similar in the two statements came exclusively from either Johnson or Webster; the incriminating information in the defendant's statement that was not similar to information in Johnson's statement was fabricated by Webster; Webster read the statements to the defendant omitting the portions that the defendant now claims he had not provided, which constituted the greater part of the statements by far; Webster prohibited the defendant from reading the statements himself; and the defendant signed the statements without reading them. Johnson's statement was probative only on the first of these issues, and only weakly so. Accordingly, we conclude that it is not reasonably possible that Johnson's statement could have influenced the jury's determination as to the credibility of Webster's testimony that the defendant was the source of the incriminating information in his third statement, much less its determination on the ultimate question of the defendant's guilt. The trial court's exclusion of the statement was, therefore, harmless.

## VII

## ADMISSION OF ESCAPE PLAN AS EVIDENCE OF CONSCIOUSNESS OF GUILT

We finally address the defendant's claim that the trial court abused its discretion in admitting a handwritten escape plan, allegedly written by the defendant, as evidence of consciousness of guilt. We disagree.

The following facts and procedural history are relevant to this claim. On December 23, 1999, during a routine search of the defendant's belongings at the time he was being processed into the Walker Reception, Special Management correction facility, correction officer Edward Corl found a piece of yellow lined paper covered with handwritten notes and with the handwritten heading, "Brainstorm." Corl read the paper and turned it over to Captain Thomas Cummings. Cummings read the document, determined that it pertained to an escape plan and placed it in a locked evidence locker. He also notified the prison's security division. When Cummings asked the defendant about the document, the defendant denied that he was plotting an escape and claimed that he had written it simply to have something to do.[33]

The state offered the document at trial as evidence of the defendant's consciousness of guilt. The defendant objected, arguing that it was not probative on the issue. The trial court, relying on our case law recognizing that evidence of an attempt to escape from custody could support a consciousness of guilt instruction, concluded that, under the circumstances of this case, the document could support an inference of consciousness of guilt. Specifically, the court noted that the defendant was awaiting trial on extremely serious charges when the document was discovered and that it was discovered within two months of his arrest and incarceration. In addition to the instructions pertaining to consciousness of guilt set forth in part IV of this opinion, the court instructed the jury that "[t]his information relating to flight or a planned escape may also reflect consciousness of guilt on the part of the defendant when considered with all the facts of the case. . . . [Y]ou must first determine whether this is a statement of the defendant

---

[33] We note that the defendant testified at trial that he had not written the escape plan.

before considering the weight it is to be given in your deliberations. . . . Planned flight, if shown, is not conclusive. It is circumstantial. And you may or may not infer consciousness of guilt from it."

The defendant claims on appeal that the trial court improperly admitted the document as evidence of consciousness of guilt because: (1) the defendant did not attempt to escape from prison, but only had prepared a plan to escape; (2) planning to escape from prison is not inconsistent with innocence; (3) the defendant was awaiting trial on charges arising from the Wethersfield incident at the time the document was discovered and, therefore, the document did not necessarily evince a consciousness of guilt with respect to this crime; and (4) the document's prejudicial effect outweighed its probative value.

The standard governing our review of evidentiary claims is set forth in part VI of this opinion. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 257, 745 A.2d 80 (2000).

This court previously has stated that "[f]light, when unexplained, tends to prove a consciousness of guilt

. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 54, 770 A.2d 908 (2001). An attempt to escape from custody after arrest is a form of flight, evidence of which may also support an inference of consciousness of guilt. See *State* v. *Burak*, 201 Conn. 517, 533, 518 A.2d 639 (1986).

This court also has stated that "[t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) *State* v. *Figueroa*, 257 Conn. 192, 197, 777 A.2d 587 (2001). "That there may have been other possible explanations for the defendant's flight goes only to the *weight* of the evidence presented by the state, and not its admissibility." (Emphasis in original.) *State* v. *Kelly*, supra, 256 Conn. 55.

Finally, this court has stated that "requiring the state to prove *which* crime caused a defendant to flee would place upon the State an impossible burden to prove that one charged with multiple violations of the law fled solely because of his consciousness that he committed one particular crime. *It is better logic to infer that the defendant, who is charged with several offenses, fled because of a conscious knowledge that he is guilty of them all.* . . . *Fulford* v. *State*, 221 Ga. 257, 258, 144 S.E.2d 370 (1965). Faced with a defendant who flees under the cloud of multiple charges . . . it is the province of the jury to sort through any ambiguity in the

evidence in order to determine whether the defendant's flight warrants the inference that he possessed a guilty conscience." (Emphasis in original; internal quotation marks omitted.) *State* v. *Kelly*, supra, 256 Conn. 57.

We first address the defendant's claim that a mere plan to escape, unlike an actual attempt, cannot evince consciousness of guilt. The defendant has cited no authority in support of this claim, and we cannot conceive of any rationale for this distinction. Although an actual escape attempt may provide stronger evidence of an actual intent to escape than an unexecuted plan, that distinction goes to the weight of the evidence, not to its admissibility. It was up to the jury in this case to decide whether the defendant, in preparing the plan, was, as he had stated to Cummings, merely passing time or, instead, was intent on escaping to avoid what he saw as the inevitable consequences of a criminal trial.

Likewise, if the jury determined that the defendant had intended to escape, the existence of possible innocent explanations would go to the weight of the evidence, not its admissibility. See id., 55. Our decision in *Kelly* also disposes of the defendant's claim that the fact that he was awaiting trial on multiple charges reduced the probativeness of the escape plan in this case. Again, that was a matter for the jury to sort out. Id., 57.

Finally, we reject the defendant's claim that the trial court improperly admitted the "[b]rainstorm" document because it was more prejudicial than probative. In support of this claim, the defendant argues that "[c]ertainly, the jury would have ignored all the innocent reasons why [the document] may have been written and undoubtedly thought [that the defendant] must have been guilty if he planned an escape." Thus, the defendant makes no claim that there is anything in the document from which the jury could infer anything

prejudicial to the defendant except that he may have planned to escape. That was the very issue on which the document was probative, however. Relevant, probative evidence is not excludable as prejudicial merely because it may tend to show that the defendant is guilty of the crime with which he has been charged. We previously have recognized that, " '[b]arring contrary evidence, we must presume that juries follow the instructions given them by the trial judge.' " *State* v. *Parrott*, 262 Conn. 276, 294, 811 A.2d 705 (2003). We will not assume that the jury was bound to ignore the trial court's instructions and treat the document as conclusive proof either that the defendant planned to escape or that, if he did so, it was because he was guilty. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the document as evidence of the defendant's consciousness of guilt.

The judgment is affirmed.

In this opinion the other justices concurred.