******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAMAAL COLTHERST
## (AC 40828)

DiPentima, C. J., and Alvord and Lavery, Js.

*Syllabus*

The defendant, who had been convicted of capital felony, murder, felony murder, kidnapping in the first degree, robbery in the first degree, robbery in the second degree, larceny in the first degree, conspiracy to commit kidnapping in the first degree, and larceny in the fourth degree, appealed to this court challenging the sentence imposed by the trial court following the court's granting of his motion to correct an illegal sentence. The defendant initially had been sentenced to life imprisonment without the possibility of release followed by seventy-one years of imprisonment. Subsequently, our legislature enacted No. 15-84 of the 2015 Public Acts, which ensures that all juveniles who are sentenced to more than ten years of imprisonment are eligible for parole. The trial court thereafter granted the defendant's motion to correct an illegal sentence and, following a resentencing hearing, sentenced the defendant to a total effective sentence of eighty years of incarceration, noting that he would be eligible for parole after a meaningful period of time. On appeal to this court, the defendant claimed that the trial court improperly failed, pursuant to statute (§ 54-91g), to account adequately for his youth at the time he committed the underlying crimes and improperly afforded him an opportunity to provide additional remarks to the court in violation of his rights to counsel, due process and allocution. *Held*:

1. The trial court properly resentenced the defendant: § 54-91g does not create a presumption against the imposition of a sentence of life imprisonment on a juvenile defendant, and the trial court was not required to make a finding that the defendant was incorrigible, irreparably corrupt, or irretrievably depraved before it properly could sentence him to life imprisonment or its equivalent, as the defendant was granted the eligibility of parole in his resentencing; moreover, the trial court's sentence was supported by the record from the resentencing hearing and the court adequately considered the factors set forth in § 54-91g, as the court considered the defendant's age, environment, criminal history and family and home environment at the time of the crimes, as well as a personality functioning test of the defendant administered by a clinical neuropsychologist and evidence concerning adolescent brain development, and the court's sentence afforded the defendant an opportunity of parole.

2. The defendant's claim that the trial court, at the resentencing hearing, improperly afforded him an opportunity to provide the court with a lengthier statement than he had provided initially was unavailing: that court afforded the defendant ample opportunity to provide a personal statement on his own behalf before being resentenced and did not interfere with the attorney-client relationship, as the defendant was afforded an opportunity to address the trial court and free to elect not to provide any statement, and the court did not force him to provide any remarks, nor was he coerced into addressing the court or induced to reveal privileged attorney-client communications; moreover, the defendant's claim that the court's invitation to him to provide additional remarks violated his rights to allocution and due process was not reviewable, the defendant having failed to brief the claim adequately.

Argued May 15—officially released September 17, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of capital felony, murder, felony murder, kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, robbery in the first degree, robbery in the second degree, larceny in the first degree and larceny in the fourth degree, brought

to the Superior Court in the judicial district of Hartford and tried to the jury before *Mulcahy, J.*; verdict and judgment of guilty; thereafter, the defendant appealed to the Supreme Court, which affirmed his conviction; subsequently, the court, *Dewey, J.*, granted the defendant's motion to correct an illegal sentence and resentenced the defendant, and the defendant appealed to this court. *Affirmed.*

*Michael W. Brown*, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Vicki Melchiorre*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Jamaal Coltherst, appeals from the judgment of the trial court resentencing him for crimes which he had committed when he was seventeen years old. The defendant claims that the court improperly (1) failed, pursuant to General Statutes § 54-91g,[1] to account adequately for the defendant's youth at the time he committed the underlying crimes, and (2) afforded the defendant an opportunity to provide additional remarks to the court, in violation of his rights to counsel, due process, and allocution. We affirm the judgment of the trial court.

The following facts, as set forth by our Supreme Court in its decision affirming the defendant's underlying criminal convictions, are relevant to this appeal: "On the morning of October 15, 1999, the defendant was released from the Manson Youth Institute, a correctional institution located in Cheshire, where he had been incarcerated for violating probation after having been convicted on charges of assault in the third degree. His mother and his grandfather picked him up at the institute and drove him to their house on Plain Drive in East Hartford. At some point during the day, a friend of the defendant, Jamarie Cole, came by to visit. The defendant and Cole were sitting outside together when, at about 3 p.m., another of the defendant's friends, Carl Johnson, came up to them. Johnson indicated that he was going to 'do something' that night. The defendant understood Johnson to mean that he was going to rob someone. Johnson told the defendant that he would meet him later and left.

"At approximately 6:30 p.m., Johnson returned to the defendant's house. Johnson was riding a mountain bike and carrying a bike for the defendant to ride. The defendant, seeing that Johnson was dressed entirely in black, went to his room and changed into black clothes. Johnson and the defendant then rode the bicycles to a parking lot near the defendant's house, where the defendant asked Johnson to show him the gun that Johnson previously had indicated he would be carrying. Johnson showed him a black .22 caliber pistol and let him hold it. They then proceeded to an exotic dance club known as Kahoots, located on Main Street in East Hartford, arriving at approximately 7:30 p.m. They parked the bicycles in the bushes behind the club and then walked around the parking lot to identify cars that they might want to carjack.

"The defendant and Johnson previously had discussed how they would commit the carjacking. Their plan was to approach the first person who came out of the club, at which point Johnson would point the gun at the person's head and demand the car keys. The defendant would take the keys, and the defendant and Johnson would force the person into the car. They

would then drive to a place far away from any telephones or cars and leave the person there. Johnson told the defendant that he had rope and tape in his backpack if they needed to restrain the person.

"The defendant and Johnson identified approximately three desirable cars in the Kahoots parking lot, but they decided to leave because it was early and they knew that people would not be leaving the club until later. At that point they rode down Main Street to the Triple A Diner, where they continued to look for cars to carjack. They determined that the diner was too busy for them to commit a robbery without being seen. They then rode their bicycles across the street to Dunkin Donuts, where they had seen a Lexus automobile in the parking lot. They hid in the bushes near the car but left after waiting for about one-half hour for the owner of the car to come out.

"The defendant and Johnson then returned to Kahoots, arriving at approximately 9 p.m. They hid their bicycles behind the Rent-A-Wreck building located next to the club. They saw a 1999 Toyota 4Runner parked in the Rent-A-Wreck parking lot and waited there for the driver to return so that they could carjack the car. While they were waiting, a black Honda Accord pulled up behind Rent-A-Wreck. The driver, later identified as Kyle Holden (victim), exited the car and went into Kahoots. Some time later, when the victim came out of Kahoots and headed toward his car, the defendant and Johnson ran up to him. Johnson pointed his gun at the victim's head and demanded the keys to the car. The defendant took them. Johnson then gave the gun to the defendant and took the keys himself. Johnson and the defendant forced the victim into the backseat of the car, where the defendant joined him. They then drove to an automatic teller machine (ATM) located next to the Triple A Diner. The defendant took the victim's wallet, removed his ATM card and demanded the victim's personal identification number. The defendant [then] gave the card to Johnson, who used it to withdraw money from the ATM.

"Johnson then drove to a nearby entrance ramp for Interstate 84, where he pulled over to the side of the road. The defendant and Johnson got out of the car, and the defendant gave the gun to Johnson. Johnson then ordered the victim to get out of the car. The victim went to the far side of the guardrail, where he sat down. The defendant removed the victim's belongings from the car and then got back into the car's passenger side seat. At that point, the defendant saw Johnson shoot the victim at point blank range in the back of the head. The victim died within seconds. Johnson then got back into the car. The defendant asked him why he had shot the victim, and Johnson said that he did not want any witnesses. Johnson had been wearing a pair of black gloves, which he placed in the car's glove compartment.

"Over the next eight days, the defendant and Johnson continued to use the car. Bank transaction records showed that, on October 16, 1999, the victim's ATM card was used at an ATM machine located on Park Avenue in Bloomfield to make three separate withdrawals from the victim's checking account, for a total of $280. A surveillance camera at that ATM machine photographed Johnson and the defendant in the victim's car as they made the withdrawals.

"Meanwhile, on October 16, 1999, East Hartford police officer Gerard Scagliola was on patrol in East Hartford when he noticed the victim's car being operated in what he considered to be a suspicious manner. He entered the car's license plate number into his cruiser's computerized search system, which revealed no irregularities. On October 19, 1999, the Avon police department received a report that the victim, who had been a resident of Avon, was missing. During their investigation, the Avon police learned of Scagliola's computer inquiry and focused their search for the victim and his car on the area of East Hartford where Scagliola had seen the car. On October 24, 1999, Sergeant Robert Whitty of the Avon police department was patrolling in East Hartford in connection with the investigation when he saw a black Honda matching the description of the victim's car. Whitty, who was in an unmarked car, followed the Honda and used a cell phone to call the East Hartford police department to request additional police officers. The Honda pulled into a parking lot on Plain Drive. Whitty pulled up behind it, exited his car and identified himself as a police officer. Four individuals, ultimately identified as Johnson, the defendant, Rashad Smith and Damion Kelly, emerged from the Honda. Whitty drew his service revolver and ordered the four individuals to lie in a prone position behind the Honda. The East Hartford police arrived within approximately one minute and arrested the four individuals.

"In the hours following his arrest, the defendant gave the police several inconsistent statements concerning his involvement in the crimes. At trial he testified and denied any involvement. He claimed that the police had fabricated the statements and that he had signed them without reading them.

"After a jury trial, the defendant was convicted of capital felony, murder, felony murder, kidnapping in the first degree, robbery in the first degree, robbery in the second degree, larceny in the first degree, conspiracy to commit kidnapping in the first degree, and larceny in the fourth degree. The trial court merged the convictions of capital felony, murder, felony murder and kidnapping in the first degree and imposed a sentence of life imprisonment without the possibility of release on the capital felony count, twenty years imprisonment on the count of robbery in the first degree, ten years imprisonment on the count of robbery in the

second degree, twenty years imprisonment on the count of larceny in the first degree, twenty years imprisonment on the count of conspiracy to commit kidnapping in the first degree, and one year imprisonment on the count of larceny in the fourth degree, all to be served consecutively to the sentence of life imprisonment, for a total effective sentence of life imprisonment without the possibility of release followed by seventy-one years imprisonment."[2] (Footnote omitted.) *State* v. *Coltherst*, 263 Conn. 478, 483–88, 820 A.2d 1024 (2003). After the defendant was sentenced, he appealed his conviction on several grounds. Id., 482–83. Our Supreme Court affirmed his conviction. Id., 524.

Subsequently, our legislature enacted No. 15-84 of the 2015 Public Acts (P.A. 15-84). "Section 1 of P.A. 15-84, codified at [General Statutes] § 54-125a, ensures that all juveniles who are sentenced to more than ten years imprisonment are eligible for parole. Section 2 of P.A. 15-84, codified as amended at . . . § 54-91g, requires a sentencing judge to consider a juvenile's age and any youth related mitigating factors before imposing a sentence following a juvenile's conviction of any class A or class B felony."[3] *State* v. *Riley* 190 Conn. App. 1, 21, 209 A.3d 646 (2019). On the basis of § 54-91g, the defendant filed a motion to correct his initial sentence with the Superior Court, which the court granted on May 23, 2017.

Resentencing was held on May 23, 2017. The defendant presented expert testimony regarding the brain science of juveniles, as well as an independent psychiatric evaluation of the defendant's history in prison, present maturity, developmental status, and his capacity for rehabilitation.

The court resentenced the defendant to a total effective sentence of eighty years incarceration, noting that he would be eligible for parole after a meaningful period of time.[4] This appeal followed. Additional facts and procedural history will be set forth as needed.

I

The defendant claims that the court, in resentencing him, did not adequately account for his youth at the time he had committed the underlying crimes. He contends that § 54-91g creates a presumption against the imposition of a sentence of life imprisonment on a juvenile defendant, and that the court's sentence was not supported by the record from the resentencing hearing and did not comport with § 54-91g. The state counters that the court's resentencing was proper. We agree with the state.

Addressing the defendant's claim requires us to determine whether the sentencing court properly resentenced the defendant and also requires us to interpret § 54-91g. "[A] trial court has wide discretion to tailor a just sentence in order to fit a particular defendant and

his crimes, as long as the final sentence falls within the statutory limits." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 34, 40, 111 A.3d 447 (2015). Whether the court properly applied § 54-91g presents a question of statutory interpretation over which our review is plenary. *State* v. *Riley*, supra, 190 Conn. App. 23; see also *Santorso* v. *Bristol Hospital*, 308 Conn. 338, 355, 63 A.3d 940 (2013) ("[t]he interpretation of a statute presents a question of law over which our review is plenary").

The following additional facts are relevant. At his resentencing hearing, the defendant presented testimony from several individuals, including his friend Michael Russell, and David Lovejoy, a clinical neuropsychologist. Russell testified that the defendant grew up in a "pretty rough environment." Russell recalled an incident in which he and the defendant were shot at while they were in a park. Furthermore, Russell testified that the defendant's mother frequently was absent, resulting in the defendant befriending poor role models.

Additionally, the court heard testimony from Lovejoy, a clinical neuropsychologist who "specialize[s] in brain behavioral relationships . . . [and who] evaluate[s] individuals where there are questions of psychiatric impairment . . . questions of adjustment, [and] questions of cognitive [ability] . . . ." Lovejoy testified that he administered "a number of cognitive tests" to the defendant, including an intelligence test, a separate test that "look[s] at higher-order problem solving, mental flexibility, [and] the ability to inhibit impulsivity," and a personality functioning test referred to as the Psychopathic Personality Inventory. Through these tests, Lovejoy concluded that the defendant "falls within the average range in terms of his IQ, his ability to solve verbal problems as well as nonverbal problems, his ability to think on his feet are all perfectly intact. The test that emphasized impulsivity and his ability to control impulsivity fell within normal limits . . . . The Psychopathic Personality Inventory largely fell within normal limits . . . . There was a spike with regard to one, and that was externalization of blame, the tendency to . . . blame others for your situation." On cross-examination, Lovejoy acknowledged that his evaluation was not performed until seventeen and one-half years after the crime and further acknowledged that it is preferable to evaluate someone as close in point of time to the crime as possible, which did not happen in this case. The court, after considering this evidence and identifying which factors it considered, rendered an oral decision and sentenced the defendant to a total effective term of eighty years incarceration.

We next turn to the relevant legal principles that govern our analysis. At the outset, we note that the United States Supreme Court has decided three cases that have "fundamentally altered the legal landscape

for the sentencing of juvenile offenders to comport with the ban on cruel and unusual punishment under the eighth amendment to the federal constitution. The court first barred capital punishment for all juvenile offenders; *Roper* v. *Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); and then barred life imprisonment without the possibility of parole for juvenile nonhomicide offenders. *Graham* v. *Florida*, 560 U.S. 48, [82], 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Most recently, in *Miller* v. *Alabama*, 567 U.S. 460, 465, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the court held that mandatory sentencing schemes that impose a term of life imprisonment without parole on juvenile homicide offenders, thus precluding consideration of the offender's youth as mitigating against such a severe punishment, violate the principle of proportionate punishment under the eighth amendment." (Footnote omitted.) *State* v. *Riley*, 315 Conn. 637, 640, 110 A.3d 1205 (2015), cert. denied, U.S. , 136 S. Ct. 1361, 194 L. Ed. 2d 376 (2016). *Miller* requires courts, when sentencing juveniles, to take into account, among other things, a defendant's "age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences," and family and home environment. *Miller* v. *Alabama*, supra, 477. In a subsequent decision, the Supreme Court extended the holding in *Miller* retroactively, ensuring that juveniles who were convicted prior to *Miller* obtain the benefit of that judgment. *Montgomery* v. *Louisiana*, U.S. , 136 S. Ct. 718, 729, 193 L. Ed. 2d 599 (2016). Our legislature enacted P.A. 15-84, which is codified at §§ 54-125a and 54-91g, in response to *Roper*, *Graham*, and *Miller*.

In light of the evidence presented at the defendant's resentencing hearing, the defendant first argues that he is entitled to a presumption against the imposition of a life sentence or its equivalent because the court did not conclude that he was "irreparably corrupt." The defendant mistakenly reads § 54-91g to create a presumption against the imposition of a life sentence for juveniles. He contends that this presumption is consistent with *Miller* and *Montgomery*, and with nonbinding precedent from other jurisdictions. Accordingly, the defendant argues that the court was required to find that the defendant was "the rare juvenile offender whose crime reflects irreparable corruption"; (internal quotation marks omitted.) *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 734; before it properly could sentence him to life imprisonment or its equivalent.

This court recently disposed of an identical argument in *State* v. *Riley*, supra, 190 Conn. App. 1. In that case, the defendant, who was convicted of murder and other crimes when he was seventeen, appealed from the judgment of the trial court following his resentencing to a term of seventy years imprisonment. Id., 4. The defendant argued that § 54-91g created a presumption against imposing a life sentence for juveniles and that the court

was required to overcome this presumption by finding that the defendant was "incorrigible, irreparably corrupt, or irretrievably depraved" before it properly could impose such a sentence. (Internal quotation marks omitted.) Id., 17. This court determined that no such finding was required, holding that "[a]lthough the defendant asserts that [§ 54-91g] creates a presumption against the imposition of a life sentence and requires a finding that the juvenile being sentenced is 'permanently incorrigible, irreparably corrupt, or irretrievably depraved' in order to overcome that presumption, our review of the statute reveals no language to support the defendant's contention." Id., 28.

"The plain and unambiguous language of [§ 54-91g] makes clear what a court must consider when sentencing a child convicted of an A or B felony. . . . [T]he sentencing court was required to *consider* only how the scientific and psychological evidence described in . . . [§ 54-91g (a)] counsels against [imposition of a life sentence]." (Emphasis in original; internal quotation marks omitted.) Id.

*Riley* cited to our Supreme Court's decision in *State* v. *Delgado*, 323 Conn. 801, 151 A.3d 345 (2016), which held that once a defendant was given the eligibility for parole, the eighth amendment requirements set forth in *Miller* did not apply. Id., 811–12. "Following the enactment of P.A. 15-84 . . . the defendant is now eligible for parole and can no longer claim that he is serving a sentence of life imprisonment, or its equivalent, without parole. The eighth amendment as interpreted by *Miller*, does not prohibit a court from imposing a sentence of life imprisonment *with* the opportunity for parole for a juvenile homicide offender, nor does it require the court to consider the mitigating factors of youth before imposing such a sentence. . . . Rather, under *Miller*, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, *without* parole." (Citation omitted; emphasis in original.) Id., 810–11. Applying the court's decision in *Delgado*, *Riley* held that the sentencing court was not required to make any particular finding that the defendant was incorrigible, irreparably corrupt, or irretrievably depraved before resentencing him because he was eligible for parole after thirty years. *State* v. *Riley*, supra, 190 Conn. App. 26.

We are bound by this court's decision in *Riley*. See id., 25 ("[b]ecause [our Supreme Court's] discussion about overcoming presumptions referred only to mandatory or discretionary life without parole sentences, the fact that the defendant no longer faced a life sentence without the opportunity of parole at the time of his resentencing rendered this aspect of *Riley* inapplicable to the defendant at the time of resentencing"). Like the defendant in *Riley*, the defendant in the present

case was granted the eligibility of parole. Therefore, we reject the defendant's argument that § 54-91g creates a presumption against the imposition of a sentence of life imprisonment on a juvenile defendant, and that the court was required to make a finding that the defendant was incorrigible, irreparably corrupt, or irretrievably depraved.

We next turn to the second part of the defendant's argument, namely, whether the court's sentence was inconsistent with the record from the resentencing hearing and with § 54-91g. We conclude that the court adequately considered the factors set forth in § 54-91g.

At the outset of sentencing, the court noted its responsibility in considering the factors set forth in *Miller* and § 54-91g. Before sentencing the defendant, the court stated: "[I am] cognizant of the need for consideration of his age, of his social factors at the time, of his impulsive nature at the time, of the environment he lived in at the time, of his educational status at the time. But I have to sentence based upon not only that but the crime that occurred."

The court first addressed scientific factors regarding the difference between adult and adolescent brains, indicating: "I absolutely accept the fact that adolescent brains mature at a slower rate. And there are questions about where age maturity is and that adolescent brains aren't necessarily mature, and some adolescents are impulsive; meaning, that adolescents can't be treated as adults for eighth amendment purposes. . . . Under the case law I need to impose a realistic opportunity for this individual to obtain release and cannot make a judgment that he's totally incorrigible."

The court further acknowledged that because each individual is different, it was difficult to compare the scientific articles and testimony presented at resentencing with the facts of this case. The court noted: "It's hard to say, especially after seventeen years, whether this individual was himself more or less mature at the time of the event. . . . [T]he risk taking that the articles talk about is self-absorption, privacy issues, mood swings, unique dress, escapism, and they call it risky behavior such as drugs and sex, impulsive acts. The articles don't talk about murder, kidnapping, and robbery." The court further noted that seventeen year olds typically do not commit murder and robbery.

The court then turned to the evidence it was presented from scholarly articles and the testimony of Lovejoy as to adolescent brain development.[5] The court noted that the defendant did not act impulsively in carrying out the crime: "It was not a spontaneous action; it was a planned event. It wasn't the result of impulsiveness; it took several hours from the initiation of the plan to the actual culmination with a murder." The court also noted that the defendant had been convicted

of a second crime that also was not carried out impulsively: "[I]t's difficult to reconcile impulsive behavior or the notion of impulsive conduct with the fact that Michael Clarke was attacked four days later, again planned, again a carjacking."[6] The court acknowledged that the defendant's brain might not have been fully developed at the time the defendant committed the crimes, but noted that this was not an excuse for the defendant's conduct: "[The defendant's] brain at the time may or may not have been developed, that's true of a lot of adolescents . . . . But the vast majority of adolescents do not engage in any type of criminal conduct at all, much less murder and kidnapping." The court, therefore, understood the defendant's criminal activity as "more than adolescent impulsiveness. [It was] just plain mean."

The court then considered the defendant's family and home environment at the time of the crimes. The court acknowledged that the defendant had a difficult childhood, as he lived in a neighborhood that was beset with drugs and violence. The court, however, noted that this factor only applied until the defendant was ten years of age, at which time he moved to a safer neighborhood.[7]

Lastly, the court considered the Psychopathic Personality Inventory of the defendant by Lovejoy, which revealed the defendant's tendency to externalize his actions, or in other words, blame his actions on another individuals. Specifically, the court focused on the fact that the defendant still blamed the murder on Carl Johnson.[8] The court was concerned that it was not apparent that the defendant "gained any real insight as to the seriousness of what he did and the real impact on the victims."

We conclude that the court considered the factors set forth under § 54-91g. The court considered the defendant's age, environment, criminal history, and Psychopathic Personality Inventory. Additionally, the court's sentence afforded the defendant an opportunity of parole. We, therefore, conclude that the defendant properly was resentenced by the trial court.

II

The defendant additionally claims that the court, at the resentencing hearing, improperly afforded him an opportunity to provide the court with a lengthier statement than he had provided initially. The defendant contends that the court knew that affording him that opportunity was contrary to his counsel's advice and also could have induced him to disclose confidential attorney-client communications in violation of his right to due process, counsel, and allocution. The defendant's claims as to due process and allocution, however, are inadequately briefed and, therefore, do not merit our review. His claim as to right to counsel is meritless.

The following additional facts are pertinent to this

issue. The court afforded the defendant an opportunity to address the court before being resentenced. The defendant indicated that in light of his understanding that he would have a limited time to address the court, he planned to offer a summary of the complete remarks he wished to deliver. The court clarified that it was not imposing a time limitation on the defendant and invited him to "[s]ay whatever you want to say. . . . I'm not going to restrict you."

The defendant then addressed the court while referencing a statement that he had prepared with his counsel. When the defendant finished his statement, the court reiterated that there was no time limitation and asked the defendant whether he wished to provide any further statement to the court. The defendant responded that he "had a whole different . . . speech" that he wanted to present, but that he elected to provide a brief statement, per his counsel's advice. The court reiterated: "[T]here was never any restriction on the time today. I don't know why there was even that impression, counsel." The court then invited the defendant to "tell [the court] what you want to tell me right now . . . ."

In response, defense counsel indicated that he advised the defendant to provide a brief statement so as not to risk revealing privileged attorney-client communications. Defense counsel further stated that his recommendation to provide a brief statement was based on strategy, and was not based on any perceived time limitation.[9] The court then responded that it would take a brief recess at which time the defendant would have an opportunity to "write down whatever else he wishe[d] to tell [the court]." Defense counsel responded "[t]hank you" before the court took recess.

When the proceeding resumed, the defendant expressed his desire to provide a lengthier statement to the court. To this, defense counsel indicated that the defendant's decision to provide a lengthier statement was contrary to the previous advice defense counsel had given him. The court informed the defendant that he was permitted to "present whatever he wishes." The defendant then provided a lengthier statement to the court.

The defendant now argues that the court's invitation to provide additional remarks infringed upon his rights to allocution, due process, and counsel. We first note that although the defendant, in his brief, expresses concern that the court infringed upon his rights to allocution and to due process, he does not brief those matters beyond a bare assertion. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief." (Internal quotation marks omitted.) *Bushy* v. *Forster*, 50 Conn. App. 233, 236, 718 A.2d 968, cert. denied, 247 Conn. 944, 723 A.2d 321 (1998) (citing *Connecticut National Bank* v.

*Giacomi*, 242 Conn. 17, 44–45, 699 A.2d 101 [1997]). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (Internal quotation marks omitted.) *State* v. *Diaz*, 94 Conn. App. 582, 593, 893 A.2d 495, cert. denied, 280 Conn. 901, 907 A.2d 91 (2006). Accordingly, the defendant's claimed violations as to allocution and due process do not merit our review.

We apply a de novo standard of review to the defendant's sixth amendment claim. *State* v. *Leconte*, 320 Conn. 500, 507, 131 A.3d 1132 (2016). The defendant essentially argues that the court's invitation to provide additional remarks undermined his counsel's advice to provide a brief statement so as not to risk revealing confidential attorney-client communications. The defendant, however, provides us with no authority to support this argument. Moreover, Practice Book § 43-10 (3) instructs that "[t]he judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence." Our Practice Book, therefore, belies the defendant's argument.

At oral argument before this court, defense counsel acknowledged that the defendant was afforded an opportunity to address the court and conceded that the defendant was free to elect not to provide any statement, as the court did not force the defendant to provide any remarks. Defense counsel's concession undermines his argument that the court induced the defendant to reveal privileged attorney-client communications. Although the defendant, in his brief, indicates that the court's invitation to provide a lengthier statement resulted in his "expos[ing] to the sentencing court that counsel had assisted the defendant in refining the statement that he chose to present to the court" and that the court's instruction directly contravened his counsel's advice, the defendant was not coerced into addressing the court whatsoever. We conclude that the court afforded the defendant ample opportunity to provide a personal statement on his own behalf before being resentenced, and, additionally, conclude that the court did not interfere with the attorney-client relationship.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 54-91g provides: "(a) If the case of a child, as defined in section 46b-120, is transferred to the regular criminal docket of the Superior Court pursuant to section 46b-127 and the child is convicted of a class A or B felony pursuant to such transfer, at the time of sentencing, the court shall:

"(1) Consider, in addition to any other information relevant to sentencing, the defendant's age at the time of the offense, the hallmark features of adolescence, and any scientific and psychological evidence showing the differences between a child's brain development and an adult's brain development; and

"(2) Consider, if the court proposes to sentence the child to a lengthy

sentence under which it is likely that the child will die while incarcerated, how the scientific and psychological evidence described in subdivision (1) of this subsection counsels against such a sentence.

"(b) Notwithstanding the provisions of section 54-91a, no presentence investigation or report may be waived with respect to a child convicted of a class A or B felony. Any presentence report prepared with respect to a child convicted of a class A or B felony shall address the factors set forth in subparagraphs (A) to (D), inclusive, of subdivision (1) of subsection (a) of this section.

"(c) Whenever a child is sentenced pursuant to subsection (a) of this section, the court shall indicate the maximum period of incarceration that may apply to the child and whether the child may be eligible to apply for release on parole pursuant to subdivision (1) of subsection (f) of section 54-125a.

"(d) The Court Support Services Division of the Judicial Branch shall compile reference materials relating to adolescent psychological and brain development to assist courts in sentencing children pursuant to this section."

[2] The defendant also was found guilty and sentenced separately in connection with his involvement in crimes committed against a second individual, Michael Clarke, which events occurred four days after the defendant was involved in the murder of the victim. The jury reasonably could have found the following facts, as set forth by this court in an earlier appeal: "On October 19, 1999, the defendant, Carl Johnson and Rashad Smith were sitting in a stolen black Honda Accord near 85 Wolcott Hill Road in Wethersfield. The trio had smoked marijuana. Sometime after darkness fell, [Clarke] returned to Camilleri and Clarke Associates, Inc., the insurance brokerage firm located there, of which he was an owner. He had left his motor vehicle, a black Lincoln Mark VIII valued at approximately $28,000, in the firm's parking lot. After [Clarke] had been in the building for some time, his dog began to bark, and so [Clarke] went outside. After [Clarke] left the building, he was accosted by the defendant and Johnson. The defendant wore a red sweatshirt or parka. [Clarke] was instructed to turn over the keys to his vehicle. One of the men pointed a gun at [Clarke], and told him to go back into the building and to his office.

"In the office, while one of the men continued to point the gun at [Clarke], the other held [Clarke]. The defendant and Johnson took [Clarke's] laptop computer and credit card. They threatened [Clarke] and ordered him to provide the access code for the card so that they could use it to obtain cash. Johnson took the computer while the defendant took the credit card. The defendant and Johnson stated that they were going to take [Clarke] to the car, and after he protested and resisted, he was struck twice in the face with the gun. [Clarke] was pushed outside, continued to struggle with the two men and broke away from them before being forced into the car. [Clarke] started to flee and called out for help, but was soon tackled by Johnson. [Clarke] then struggled with the defendant, who took out a .22 caliber Beretta and shot [Clarke] in the head. The defendant and Johnson fled the scene in [Clarke's] Lincoln while Smith drove the Honda Accord.

"Oscar Rivera, a Wethersfield police officer, arrived at the scene after being notified of the assault. He found [Clarke] lying on the ground in the parking lot, which was otherwise empty. At that time, [Clarke] was responsive, but had suffered visible injuries. Medical [personnel] subsequently transferred [Clarke] to Hartford Hospital for treatment. [Clarke] was hospitalized for nine to ten days and then was transferred to a rehabilitation facility for an additional seven weeks of therapy.

"Leslie Higgins, an employee of United States Automobile Association, the company that issued [Clarke's] credit card, testified that on the night of the shooting, there were several attempts at various automatic teller machines to obtain cash with the card taken by the defendant. The first three attempts were declined due to an incorrect access code, and the fourth failed as a result of an automatic lock out due to the previous incorrect access codes. Higgins further testified that [Clarke's] card was used on October 21, 1999, to make several purchases, totaling seven hundred dollars, at various stores in Manchester. Eventually, a hold was placed on the account due to suspected fraudulent activity.

"On October 24, 1999, Sergeant Robert Whitty of the Avon police department stopped a black Honda Accord carrying the defendant, Johnson, Smith and Damion Kelly. A search of the vehicle revealed [Clarke's] credit card, credit card receipts that matched [Clarke's] credit card, items purchased with [Clarke's] credit card and a .22 caliber bullet that subsequently was determined to have been of the same caliber used in the shooting. Addition-

ally, after searching the defendant's residence, the police recovered a pair of the defendant's boots that were stained with [Clarke's] blood, a computer case containing [Clarke's] business card and a red jacket.

"The defendant subsequently was arrested, tried before the jury and convicted on all of the fifteen counts with which he had been charged." (Footnotes omitted.) *State* v. *Coltherst*, 87 Conn. App. 93, 96–99, 864 A.2d 869, cert. denied, 273 Conn. 919, 871 A.2d 371 (2005). Well after his conviction, the defendant filed a motion to correct an illegal sentence in that case, asserting that his sentence constituted cruel and unusual punishment under the eighth amendment. On December 7, 2017, the motion was dismissed by the trial court. The defendant, again, appealed and this court has stayed that case pending the resolution of our Supreme Court's decisions in *State* v. *Williams-Bey*, SC 19954, and *State* v. *McCleese*, SC 20081.

[3] General Statutes § 54-91g (a) provides, in relevant part, that a court shall "(1) [c]onsider, in addition to any other information relevant to sentencing, the defendant's age at the time of the offense, the hallmark features of adolescence, and any scientific and psychological evidence showing the differences between a child's brain development and an adult's brain development" and shall "(2) [c]onsider, if the court proposes to sentence the child to a lengthy sentence under which is it likely that the child will die while incarcerated, how the scientific and psychological evidence described in subdivision (1) of this subsection counsels against such a sentence."

[4] This sentence was in addition to the sentence that was imposed by the trial court in regard to the crimes committed against Michael Clarke. See footnote 2 of this opinion.

[5] The court acknowledged the neuropsychological report that was presented at the hearing and concluded that it contained similar arguments that were set forth in the scholarly materials, which were provided to the court.

[6] See footnote 3 of this opinion.

[7] The court referred to letters that it received at resentencing, asserting that after the defendant moved to East Hartford he was surrounded by "good families . . . good friends, [and a] good neighborhood."

[8] The defendant stated, per the presentence investigation report: "I wasn't the one that pulled the trigger; I didn't kill your son. I'm sorry for what happened to your son. No one should be subjected to dying like that. I have changed tremendously; I value life now."

[9] "[Defense Counsel]: I don't want to get into the conversations I had with my client, but it wasn't based on you not allowing it. It was based on a strategic decision that I'm very uncomfortable with discussing at this point."